UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>HDR GLOBAL TRADING LTD.,<br><br>*Defendant*. | Case No. 24-cr-00424 (JGK) |

**SENTENCING MEMORANDUM ON BEHALF OF HDR GLOBAL TRADING LTD.**

A&O SHEARMAN
ALLEN OVERY SHEARMAN
STERLING US LLP
1221 Avenue of the Americas
New York, NY 10020

David Esseks
Eugene Ingoglia
Melinda Bothe (admitted *pro hac vice*)
Megan Sharkey

*Attorneys for Defendant HDR Global Trading Ltd.*

September 6, 2024

# TABLE OF CONTENTS


1. PRELIMINARY STATEMENT ..... 1

2. THE OFFENSE CONDUCT ..... 5

3. HISTORY OF REGULATORY AND CRIMINAL PROCEEDINGS ..... 7

   (a) Civil Enforcement by the CFTC and FinCEN ..... 7

   (b) Criminal Charges Against HDR's Founders ..... 10

4. REMEDIATION ..... 11

5. NO FURTHER PENALTY IS REQUIRED OR APPROPRIATE ..... 14

   (a) Applicable Law ..... 15

   (b) Sentencing Guidelines ..... 15

   (c) 18 U.S.C. § 3553(a) Factors. ..... 19

      (i) Seriousness of the offense ..... 19

      (ii) Respect for the law and just punishment ..... 20

      (iii) Deterrence ..... 22

      (iv) To protect the public from further crimes of the defendant ..... 23

      (v) To avoid unwarranted sentencing disparities ..... 23

6. IRRELEVANT ALLEGATIONS OF FALSE STATEMENTS TO A FINANCIAL INSTITUTION ..... 23

7. CONCLUSION ..... 26

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*CFTC v. HDR Glob. Trading Ltd.*,
No. 1:20-cv-08132-LTS (S.D.N.Y. Aug. 10, 2021) ..... 8

*Gall v. United States*,
552 U.S. 38 (2007) ..... 15

*Kimbrough v. United States*,
552 U.S. 85 (2007) ..... 15

*Nelson v. United States*,
555 U.S. 350 (2009) ..... 15

*Peugh v. United States*,
569 U.S. 530 (2013) ..... 15

*United States v. Hayes*,
No. 1:20-cr-00500-JGK (S.D.N.Y. Oct. 2, 2020) ..... *passim*

*United States v. HDR Glob. Trading Ltd.*,
No. 1:24-cr-00424-JGK (S.D.N.Y. July 10, 2024) ..... 23

**Statutes**

18 U.S.C. § 3553(a) ..... 15, 23

**Other Authorities**

U.S. Sent'g Guidelines Manual (U.S. Sent'g Comm'n 2023) ..... 15, 17

HDR Global Trading Limited ("HDR" or "the Company") respectfully submits this memorandum in connection with its sentencing scheduled for October 7, 2024. For the reasons set out below, including the comprehensive remedial measures the company has undertaken and the millions of dollars it and its founders already have paid to U.S. authorities in connection with the conduct underlying the offense, no further financial penalty for the Company should be imposed.

## 1. PRELIMINARY STATEMENT

The U.S. Commodity Futures Trading Commission (the "CFTC") began investigating the nature and extent of HDR's operation of the BitMEX platform in the United States in 2018, and the government's criminal investigation followed in 2019. The criminal investigation became apparent to HDR in July 2019, when it received a grand jury subpoena. Since then, the Company has produced documents and information to the government in a cooperative posture, including after its founders and owners, Messrs. Arthur Hayes, Ben Delo, and Sam Reed, were each indicted in October 2020 for conspiracy and substantive violations of the Bank Secrecy Act ("BSA") by operating the BitMEX platform, through HDR, in the United States without complying with the BSA's anti-money laundering ("AML") and Know-Your-Customer ("KYC") requirements. *See* Indictment, *United States v. Hayes*, No. 1:20-cr-00500-JGK (S.D.N.Y. Oct. 2, 2020), ECF No. 2.[1] While its founders awaited trial on those charges, HDR settled a civil suit by the CFTC alleging a failure to comply with BSA obligations imposed on HDR by the Commodity Exchange Act (the "CEA") and its implementing regulations, and an investigation by the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") alleging a direct violation of the BSA. HDR paid $80 million in penalties to the CFTC and FinCEN in August 2021, with an

[1] Any subsequent citations to docket filings in this submission refer to the docket in *United States v. Hayes*, No. 1:20-cr-00500-JGK (S.D.N.Y.).

additional $20 million of penalties foregone by FinCEN contingent on HDR complying with two undertakings: a Suspicious Activity Report ("SAR") lookback review for suspicious transactions and U.S. person controls testing to be overseen by an external consultant. HDR successfully completed those obligations in 2022, satisfying FinCEN that its controls are sufficient to ensure no U.S. person is a customer of BitMEX, and that all historical suspicious transactions on the platform have been reported to FinCEN.

Meanwhile, the HDR founders each pleaded guilty in February and March 2022 to one count of causing BitMEX to violate the BSA. They did so pursuant to plea agreements that quantified the gain from the offense at $10 million, allowed that $10 million to also be used to pay a CFTC fine to settle the same civil case that HDR had settled the prior year, and provided for a Guidelines range of six to twelve months (zero to six months for Mr. Reed).

As the Court knows, in the summer of 2022, the parties in *Hayes* engaged in spirited advocacy regarding the nature of the offense and the appropriate sentence for the individual defendants. The government contended that the Company was a criminal enterprise, arguing in particular that the HDR founders built the Company on the BSA violation and enabled a significant quantity of misconduct to occur on the BitMEX platform, and that the Guidelines for the BSA violation did not adequately measure the seriousness of the offense committed by the individual defendants. The defense responded that sentencing on a BSA violation should be driven by the Guidelines for a BSA violation and not some other calculus. The Court noted that "the government chose not to accuse the defendant of money laundering or fraud," and observed that while "the applicable guideline in this case does not take into account the amount of the monetary transactions involved, that was the result of the government's choice of the appropriate offense for which it sought an indictment from the grand jury and is the consequence of the offense to which the

defendant pleaded guilty." Hayes Sent'g Tr. 54:15–16, 54:19–24 ECF No. 342; *see also* Delo Sent'g Tr. 26:14–16, ECF No. 380; Reed Sent'g Tr. 23:10–15, ECF No. 396. The Court imposed Guidelines or below Guidelines sentences on each defendant. In particular, the Court sentenced each of the defendants to the stipulated $10 million fines, and in addition sentenced Mr. Hayes to two years' probation with a condition of home confinement for six months, Mr. Delo to thirty months' probation served abroad without a condition of home confinement, and Mr. Reed to eighteen months' probation without a condition of home confinement.

The government was not happy with the sentences imposed on the HDR founders. Three weeks after the Court sentenced Mr. Hayes, the government asked the Company to address the question whether it should be prosecuted for the BSA violation to which its owners had pleaded guilty and for which the Court was in the process of imposing noncustodial sentences. The Company engaged in advocacy before the government over the ensuing 16 months. In October 2023, the government informed the Company that it would be charged with violating the BSA. The government filed the charge on July 10, 2024, and HDR entered its guilty plea the same day.

The Court must now determine the appropriate sentence for HDR in this unusual context. The violation has been conceded and accepted by the Company and its owners for years. The Company, directly and through its owners, has paid the United States $110 million in civil and criminal penalties and had an additional $20 million in penalties foregone in light of its satisfaction of FinCEN's compliance requirements. The Company has long since implemented market-leading KYC and AML controls, ensuring that no U.S. person is able to trade on the BitMEX platform. And its business is a faint shadow of its former self: in 2019, when this investigation began, BitMEX was by far the largest exchange in the crypto derivatives market by volume; today the

platform does not come within the top fifty cryptocurrency derivatives exchanges by twenty-four hour trading volume.[2]

The HDR founders have been prosecuted for this crime and have paid the full price deemed appropriate by the Court. HDR has suffered a serious downdraft in its business fortunes. The Company has settled with the applicable U.S. regulators and reformed its operations to insulate it entirely from the U.S. market. And now, after five years of contemplation, the government, dissatisfied with the Court's sentences for the individual defendants, insists on prosecuting their entity in pursuit of a further pound of flesh. In doing so, the government is walking away from its representations to the Court regarding gain from the offense, without explanation or justification.

No further financial penalty is warranted here. The goals of sentencing for this offense have been met and the Company, directly and through its owners, has already paid the United States very substantially more than what the Guidelines recommend as a penalty for the offense. In particular, the sentences imposed on the individual defendants for the same offense, the penalties paid by HDR to other arms of the United States government for the same conduct, the undertakings to FinCEN made and met by the Company, and the remedial steps taken by the Company on its own are sufficient:

- to reflect the seriousness of the offense;
- to promote respect for the law;
- to provide just punishment for the offense;
- to afford adequate deterrence to criminal conduct; and
- to protect the public from further crimes of the defendant.

---

[2] *Compare* BitMEX Research, *March 2020 Report Into Cryptocurrency Exchanges (from CryptoCompare)*, BitMEX (Apr. 3, 2020), https://blog.bitmex.com/march-2020-report-into-the-cryptocurrency-exchange-industry-from-cryptocompare/ *with Top Cryptocurrency Derivatives Exchanges*, CoinMarketCap, https://coinmarketcap.com/rankings/exchanges/derivatives/ (last visited Sept. 5, 2024, 17:00).

We address each of these points below and submit that no further penalty is necessary or appropriate.

## 2. THE OFFENSE CONDUCT

HDR owns and operates the online BitMEX platform that provides various cryptocurrency-related trading products, including futures and other derivatives contracts tied to the value of cryptocurrencies. HDR began as a start-up company, launching BitMEX for trading in November 2014 with no other employees than its founders, who were at the time based in Hong Kong.[3] The BitMEX platform had limited success with low trading volumes for the first couple of years. Demand then increased sharply in 2017, and BitMEX suddenly became one of the most successful cryptocurrency trading platforms of the time. HDR saw enormous growth in a one-year period: the Company's revenue for 2016 was $943,000 but leapt to $84 million for 2017. The Company's active user base likewise grew from roughly 3,700 to over 45,000 users the same year. HDR attributes this sudden success to various features that were unique to BitMEX, such as the introduction of its perpetual contract in May 2016, which was available only on BitMEX for at least the first few years and remains today the most popular crypto derivatives product traded globally,[4] and its then-uniquely high leverage for trading.[5] In addition, there was a growing interest in cryptocurrencies generally at that time, and HDR made the strategic decision to focus BitMEX

---

[3] During the relevant period, Mr. Hayes was the Company's Chief Executive Officer, Mr. Delo was first Chief Operating Officer and later its Chief Strategy Officer, and Mr. Reed was, for a time, Chief Technology Officer. The HDR founders continue to own approximately 91% of the Company.

[4] The launch of the perpetual contract on BitMEX was groundbreaking—today, nearly every other crypto trading platform offers a version of the perpetual contract that the founders invented for BitMEX, and the perpetual contract has been the most traded cryptocurrency derivative product of all time, with its trading estimated at 92% of all bitcoin derivatives volume worldwide. *See* Checkmate, *The Growing Dominance of Perpetual Swaps*, Glassnode Insights (Apr. 25, 2022), https://insights.glassnode.com/the-week-onchain-week-17-2022/. Coinbase, another cryptocurrency exchange, found that, in the first quarter of 2024, bitcoin perpetual contracts were the most actively traded product across all of crypto, and had a daily average volume three times higher than the daily average volume for bitcoin spot transactions. *See* David Han, *Trading Insights: A Primer on Perpetual Futures*, Coinbase (June 10, 2024), https://coinbase.bynder.com/m/61e31f57f674ff53/original/MktIntel_2024-06-10_Perps-1.pdf.

[5] Like the perpetual contract, while BitMEX was the first to offer high leverage products, many other platforms have since followed.

marketing on the high-growth crypto markets in Asia and Russia.[6] With the increased revenue, the founders began to expand the Company rapidly in 2017 and, over the course of the next few years, HDR became a scaled fintech business with staffed business functions such as finance, customer support, legal, compliance, and business development.

The Company had publicly announced it was banning U.S. users from BitMEX in September 2015, before the dramatic growth in user base, and incorporated this ban into the terms of service. HDR also implemented a series of controls that were enhanced over time to detect and block U.S. users from the BitMEX platform. Namely: by October 2015, the Company required all potential users to declare a country of residence when registering a BitMEX account and tested this registration with an automated GeoIP check to block apparent U.S. users from depositing funds to the platform; then, by December 2018, the Company implemented an automated GeoIP check at every account login to detect and restrict apparent U.S. and other restricted users from any future trading on BitMEX;[7] also in 2018, the Company updated its corporate onboarding procedures to require corporate users to attest in writing that all trading decisions were made outside the U.S. HDR's customer support team during this period also had written guidance on how to identify and manually block apparent U.S. users who had contacted them for support and, at times, screened the available user data to manually identify and restrict apparent U.S. users who managed to access BitMEX despite the controls, including those who had registered an account before the controls were in place. While the government has cynically derided these increasingly

---

6 To support these marketing efforts, HDR translated the BitMEX website and Mr. Hayes' Crypto Trader Digest blog into Russian, Korean, Japanese, and Chinese languages. Moreover, by August 2016, the Company made the BitMEX platform itself available in Chinese language, which took significant effort.

7 The two controls worked in different ways: the automated GeoIP check at account registration prevented users with U.S. IP addresses from receiving their BitMEX deposit addresses, which are required to deposit funds to the platform for trading (users could still deposit funds if they already had a BitMEX address and saved it elsewhere); the automated GeoIP check at account login, by contrast, restricted the user from any future trading on BitMEX (the user could still close any open positions).

tightened controls as a sham, the measurable effect of these procedures was to turn away over $100 million in revenue from U.S. users. *See* Delo Sent'g Mem. Ex. I, ECF No. 347.

However, as each founder described for the Court, these evolving processes and controls were meaningful but not fully effective, and some U.S. users continued to gain access to the BitMEX platform during the relevant period, giving HDR a presence in the U.S. market. *See* Hayes Plea Tr. 18:12–16, ECF No. 302; Delo Plea Tr. 17:21–18:17, ECF No. 304; Reed Plea Tr. 25:20–26:7, ECF No. 314. Despite knowing that some U.S. users were trading on BitMEX, HDR willfully failed to implement BSA-compliant AML and KYC programs during that time, resulting in the BSA violation at issue for sentencing.

## 3. HISTORY OF REGULATORY AND CRIMINAL PROCEEDINGS

The federal government has already addressed HDR's presence in the U.S. market in three ways: civil enforcement by the CFTC of the Company's and the founders' failures to comply with the BSA as applied through the CEA to HDR's business; civil enforcement by FinCEN against the Company for the BSA violation; and the criminal prosecution of the HDR founders and senior employee Gregory Dwyer for the same BSA violation.

### *(a) Civil Enforcement by the CFTC and FinCEN*

The CFTC began investigating the Company in 2018 and filed a civil complaint against the Company and its founders on October 1, 2020, alleging that the defendants had, among other things, failed to register with the CFTC as a futures commission merchant and failed to comply with the BSA, as applicable to the Company through the CEA and related regulations. In September 2020, the Company received a notice of investigation and requests for information from FinCEN, also inquiring into the Company's compliance with the BSA.

The Company settled with both agencies on a no admission/no denial basis on August 10, 2021 for a total of $100 million, with $50 million paid to the CFTC, $30 million paid to FinCEN, and $20 million in additional penalties to be paid to FinCEN if the Company failed to complete two undertakings. *See* Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief, *CFTC v. HDR Glob. Trading Ltd.*, 1:20-cv-08132-LTS (S.D.N.Y. Aug. 10, 2021), ECF No. 62 (hereinafter "CFTC Consent Order"); *Assessment of Civil Monetary Penalty In the Matter of: HDR Global Trading Limited et. al*, Number 2021-02, FinCEN (Aug. 10, 2021), https://www.fincen.gov/sites/default/files/enforcement_action/2021-08-10/Assessment_BITMEX_508_FINAL.pdf (hereinafter "FinCEN Consent Order").

As part of the CFTC settlement, HDR certified to the CFTC twice (first at the time of settlement in August 2021 and again in November 2021) that: (1) U.S. persons are prohibited from accessing the BitMEX platform; (2) all active BitMEX users have undergone the Company's KYC or user-verification processes; (3) all users identified as U.S. persons or that did not fulfill the Company's KYC requirements have been blocked from trading on the BitMEX platform; and (4) the Company will no longer maintain any operations or business functions in the U.S. aside from limited back office functions that conduct no marketing or solicitation of customers. *See* CFTC Consent Order ¶¶ 48–49.

For FinCEN, the Company completed two undertakings pursuant to settlement:

(1) First, the Company hired an external consultant, Guidehouse, to identify the historical BitMEX transactions for which a SAR should have been filed with FinCEN pursuant to 31 U.S.C. § 5318(g) and the implementing regulations. *See* FinCEN Consent Order § VI(A). Guidehouse reviewed all BitMEX transactions that occurred within a six-year lookback period (from November 1, 2014 until

December 12, 2020) pursuant to a methodology vetted and approved by FinCEN, and submitted a report with its findings to FinCEN in December 2021.[8] The Company then filed 378 SARs with FinCEN pursuant to Guidehouse's recommendation.

(2) Second, the Company hired Guidehouse, as approved by FinCEN, to conduct two separate reviews to test the effectiveness of the Company's U.S. persons controls embedded within its KYC and AML programs to prevent U.S. persons from accessing the platform, and to ensure HDR's physical presence in the U.S. was limited to back-office functions that did not engage in marketing or customer solicitation.[9] *See* FinCEN Consent Order, § VI(B). Guidehouse submitted two reports to FinCEN—the first on November 6, 2021 and the second on July 28, 2022—finding the Company's policies and controls to be "effective" (and, by the second report, certain controls were rated "strong") at keeping U.S. users off BitMEX and confirming that BitMEX no longer had a presence in the U.S. *See* Ex. A, Guidehouse's First Assessment of BitMEX's U.S. Persons Controls, at 4; Ex. B, Guidehouse's Second Assessment of BitMEX's U.S. Persons Controls, at 4.

Accordingly, the Company fulfilled its obligations under the CFTC and FinCEN settlements by paying the $80 million monetary penalty, certifying that it no longer had a U.S. presence, and completing the two undertakings, with the additional $20 million in penalties to

---

8 This review period covered 5,097,318 transactions involving 116,734 active customers. Guidehouse's methodology incorporated Chainalysis's Know-Your-Transaction technology.

9 Specifically, HDR agreed in the FinCEN Consent Order to obtain an independent consultant to "conduct two reviews, including testing of BitMEX's operations, policies, procedures, and controls, including its User Verification Program, to confirm that they are effective and reasonably designed and implemented to ensure that BitMEX is not operating wholly or in substantial part in the United States." FinCEN Consent Order § VI(B) ¶ 1.

FinCEN foregone in light of such successful completion. The Company is operating wholly outside the U.S. to the satisfaction of those agencies.

*(b) Criminal Charges Against HDR's Founders*

On October 1, 2020, the same day the CFTC filed its suit against the Company and its founders, the government unsealed a criminal indictment against the HDR founders and a senior employee, Mr. Dwyer, charging the individuals with one count of violating the BSA by operating BitMEX without BSA-compliant AML and KYC programs, in violation of 31 U.S.C. § 5318 *et seq*., and one count of conspiracy for the same. *See* Indictment, *Hayes,* ECF No. 2. Messrs. Hayes and Delo pled guilty to the BSA charge on February 24, 2022; Mr. Reed pled guilty to the same charge on March 9, 2022; and Mr. Dwyer pled guilty to the BSA charge on August 8, 2022.[10] In *Hayes*, each HDR founder individually acknowledged the Company's insufficient AML and KYC programs during the relevant period of conduct, and their role in the violation. *See, e.g.*, Hayes Plea Tr. 18:15–24 ("Notwithstanding [HDR's U.S. persons prohibition], I was aware that some U.S. residents gained access to the platform. During the indictment period, I understood that there would be a requirement under U.S. law for BitMEX to implement a KYC program if the platform provided services to U.S. residents. However, from the time of its launch in November 2014 and continuing until September 30, 2020, the BitMEX platform did not have a comprehensive AML or KYC program. I participated in the decision to launch and operate the platform without an AML / KYC program.").

This Court sentenced each of the three HDR founders to a fine of $10 million and to varying terms of probation. *See* Hayes Sent'g Tr. 56:2–10 (two years' probation with a condition of home detention for six months, with location monitoring); Delo Sent'g Tr. 28:11–13 (thirty months'

---

[10] This Court sentenced Mr. Dwyer on November 16, 2022 with a monetary fine of $150,000 and one year of probation. ECF No. 422.

probation served abroad); Reed Sent'g Tr. 26:15–18 (eighteen months' probation). The government and this Court agreed that each of the founders' $10 million fines could be offset in full by the amount the founders paid to the CFTC for the same conduct. *See* Hayes Sent'g Tr. 55:20–24 (The Court: "And indeed, the only monetary penalty in this case has already been paid as a result of the CFTC action, and that monetary penalty roughly reflects the amount of pecuniary gain from the offense."); Delo Sent'g Tr. 28:21–23 (The Court: "The defendant's obligation to pay a $10 million fine has been satisfied by his payment of the $10 million penalty to the CFTC."); Reed Sent'g Tr. 23:16–19 (The Court: "There has been disgorgement as a result of the defendant's payment of the $10 million penalty to the CFTC. The penalty also satisfies the fine in this case.").

**4. REMEDIATION**

HDR today is a wholly different company than when the government pursued the civil actions and criminally charged its founders. The Company now operates entirely outside the U.S., with no physical U.S. presence and, as tested by Guidehouse twice, with an effective and market-leading KYC program that allows the Company to record and verify the identity and location of each of its users.

HDR's Compliance Program is effective through its four essential components, each supported by written policies and procedures:

(1) First, HDR requires every potential user to undergo KYC. To complete the KYC process, every user must submit identification documentation, which is verified by an external vendor, Onfido, and provide information on residence and physical location, including by GeoIP check. Onfido is used to verify the identity of the individual including conducting liveness, likeness, and presence tests, along with advanced fraud detection. HDR also screens the names provided during KYC against sanctions lists, politically exposed persons lists, and adverse news through

another vendor, Refinitiv WorldCheck One. This includes screening against U.S. OFAC lists, with all lists updated daily and rescreening conducted weekly. Any user who demonstrates a U.S. or sanctions-related touchpoint when attempting to complete KYC is prohibited from registering a BitMEX account. The KYC process includes detection and prevention of the use of VPN technology by prospective users that may attempt to bypass existing GeoIP checks. The KYC review process is designed to automatically reject or flag any user that may have a nexus to the U.S. using the KYC orchestration tool from Moody's Passfort;

(2) Second, in addition to KYC, HDR conducts ongoing account monitoring to ensure that, once registered, users do not, for example, move to a prohibited jurisdiction, such as the U.S. or a sanctioned jurisdiction, and continue to trade on BitMEX. The Company uses ongoing GeoIP checks at multiple points of user activity, including at every account login, withdrawal request and withdrawal confirmation, to monitor account activity; any users detected by GeoIP check as apparently being in such jurisdictions are automatically restricted and lose full account access. HDR also conducts routine screening of its userbase to assess whether its risk with respect to any user has changed since KYC;

(3) Third, the Company has implemented enhanced geolocation restrictions that include geo-blocking all Sanctioned Jurisdictions, resulting in the Company website being unavailable in all OFAC comprehensively sanctioned jurisdictions. In addition, users are prevented from being able to access the Company's platform where they are detected to be physically located in the U.S.

(4) Lastly, through its AML program, HDR performs ongoing transaction monitoring (a/k/a know-your-transaction screening) using an industry leading vendor, Chainalysis. In particular, HDR automatically screens all deposits to and withdrawals from the BitMEX platform to detect whether those transactions have direct or indirect exposure to risky counterparties or wallets, such as those belonging to sanctioned entities or engaged in darknet markets. The Company has also established behavioral-based transaction monitoring scenarios to monitor for unusual or suspicious transaction patterns. This process was designed to identify activity that may be indicative of money laundering and terrorism financing, similar to the processes used by traditional financial institutions. This activity is managed by a dedicated AML Investigations team that has deep industry expertise investigating activity that may be indicative of money laundering, terrorism financing, or sanctions evasion. Where suspicion is established in such cases, a Suspicious Activity Report will be submitted to relevant authorities.

HDR employs a properly staffed compliance team, comprised of experienced professionals familiar with the traditional banking and cryptocurrency industries, to support and maintain its Compliance Program. Notably, the Compliance Team reports to HDR's Group General Counsel, who sits on HDR's Executive Committee, which also includes the Chief Executive Officer, Chief Growth Officer, Head of Product & Institutional Business Development, and Head of Finance & Risk—all selected in part to reinforce a culture of compliance. The Group General Counsel has direct access to the Board of Directors to apprise them of any material changes to the Compliance Program. The Compliance Team and the Group General Counsel have been granted the autonomy and authority to implement an effective compliance program, independent of the business units.

The Company remains committed to operating in compliance with all applicable laws, regulations, and regulatory guidance. Since 2019, the Company has invested more than $20,000,000 in building out its risk and Compliance Program. Over and above the previously highlighted changes it has implemented, the Company has invested significantly to build out a dedicated Compliance Program through a multi-faceted approach: establishing a risk-based program overseen by a Chief Compliance Officer, formal oversight and governance by the Board and Executive Committee, establishing a three-lines-of-defense model, and implementing robust KYC, Enhanced Due Diligence, transaction monitoring and market integrity measures. The Company prioritizes staff training, conducts regular independent reviews, cooperates with requests from regulatory and law-enforcement authorities, and enforces restrictions on services in restricted or high-risk jurisdictions. These initiatives, combined with partnerships with industry leaders, reflect the Company's dedication to building a strong compliance framework and mitigating financial crime risks.

HDR today is a fully remediated company with no U.S. presence. HDR sets a powerful and beneficial example for others in the industry to follow.

## 5. NO FURTHER PENALTY IS REQUIRED OR APPROPRIATE

As this Court knows well, the goal of a criminal sentencing is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals." *Kimbrough v. United States*, 552 U.S. 85, 89 (2007). Here, the goals of sentencing have been accomplished already and the Company has already paid the United States a multiple of the penalty recommended by the Guidelines.

*(a) Applicable Law*

While the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *Peugh v. United States*, 569 U.S. 530, 536 (2013), the resulting range is "not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). Rather, the Court must make an "individualized assessment," *Gall v. United States*, 552 U.S. 38, 50 (2007), using the applicable Guidelines range as "the starting point and the initial benchmark." *Peugh*, 569 U.S. at 536. The Court should then determine a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of the sentencing law as applied uniquely to HDR. *See* 18 U.S.C. § 3553(a) (providing relevant factors).

*(b) Sentencing Guidelines*

The organizational Guidelines are driven by the gain or loss from the offense. *See* U.S.S.G. § 8C2.4(a). Here, there is no loss associated with any of the offense conduct, and therefore gain is the key metric for determining an appropriate Guidelines range. Gain from the offense here maps to profit from U.S. users trading on the BitMEX platform, as the offense is operating the platform with U.S. users and without BSA-compliant KYC and AML programs; without those U.S. users there is no offense and so the monetary differential between crime and no crime is the profit from those U.S. users.

In *Hayes*, the government expressly stipulated with each founder that $10 million "represent[ed] pecuniary gain derived by the defendant from the offense," Hayes Plea Agreement at 2, *Hayes*, No. 20-cr-500-JGK (Feb. 18, 2022); Delo Plea Agreement at 2, *Hayes*, No. 20-cr-500-JGK (Feb. 18, 2022); Reed Plea Agreement at 2, *Hayes*, No. 20-cr-500-JGK (Mar. 9, 2022), and the government and the Court confirmed with each defendant that their gain from the offense was $10 million each, Hayes Plea Tr. 19:24–20:5 (AUSA Greenwood: "On page 2 of the plea

agreement, your Honor, the application of the alternative fine provision under 18 U.S.C. Section 3571(d) is based on a stipulation between the parties that the $10 million stipulated fine amount represents pecuniary gain derived by the defendant from the offense. We wanted to make sure that was read into the record for purposes of today."); Delo Plea Tr. 20:23–25 (The Court: "[A]s part of the plea agreement, you agree to pay a criminal fine of $10 million, representing pecuniary gain derived by you from the offense."); Reed Plea Tr. 20:25–21:4 (C.J. Swain: "Do you understand that on page two, the [plea] agreement provides that you are agreeing to pay a criminal fine in the amount of $10 million, representing pecuniary gain that you derived from your offense?" Mr. Reed: "Yes, your Honor."), or $30 million in total for HDR as each founder owns approximately 30% of the Company. The defendants agreed. *See, e.g.*, Hayes Plea Tr. 20:7–10 (The Court: "Mr. Hayes, do you agree that the $10 million in United States currency represents the pecuniary gain derived by you from the offense?" Mr. Hayes: "Yes."); Delo Plea Tr. 21:2–4 (Mr. Delo: "I understand that the maximum fine pursuant to the stipulated fine position in the plea agreement has been enlarged to $10 million based upon pecuniary gain."); Reed Plea Tr. 21:5–8 (C.J. Swain: "Do you agree that $10 million appropriately represents the pecuniary gain derived by you from the offense?" Mr. Reed: "Yes, your Honor.").

The Court sentenced the three founders on that basis, finding based on the parties' agreement that $10 million each, $30 million total, "roughly reflects the amount of pecuniary gain from the offense." Hayes Sent'g Tr. 55:20–23; *see also* Delo Sent'g Tr. 26:18–19 (The Court: "There has been disgorgement as a result of the payment of the $10 million CFTC penalty."); Reed Sent'g Tr. 23:16–18 (The Court: "There has been disgorgement as a result of the defendant's payment of the $10 million penalty to the CFTC."). The government announced as much to the public: "Hayes, 36, of Miami, Florida, was sentenced to six months of home detention and two

years of probation. Hayes also agreed to pay a fine of $10 million dollars representing his pecuniary gain from the offense." Ex. C, Press Release, U.S. Att'y's Off., S.D.N.Y., *Founder And CEO Of Off-Shore Cryptocurrency Derivatives Platform Sentenced For Violating The Bank Secrecy Act* (May 20, 2022), https://www.justice.gov/usao-sdny/pr/founder-and-ceo-shore-cryptocurrency-derivatives-platform-sentenced-violating-bank.

Based on the government's stipulation, the gain for the Company is $30 million.

The Guidelines then require calculation of the culpability score:

<u>Culpability Score</u>

| | | |
|---|---|---|
| (a) | Base Score | 5 |
| (b)(4) | Organization with between 50 and 200 employees | +2 |
| (g)(3) | Organization clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -1 |
| <u>Total</u> | | <u>6</u> |

U.S.S.G § 8C2.5.

With a culpability score of 6, U.S.S.G § 8C2.6 provides for a minimum multiplier of 1.2 and a maximum multiplier of 2.4, resulting in a fine range of $36 million to $72 million.

There are two significant offsets to this figure: one reflected in the Guidelines itself and one in the government's and the Court's recognition in *Hayes* that settlement of the parallel CFTC enforcement action should be credited against the applicable criminal fine for this offense.

First, the Guidelines recognize that where the owners of a closely-held corporation have been fined for criminal conduct, the Court may offset any fine against the entity by those paid by the owners, on an ownership-proportionate basis. U.S.S.G § 8C3.4. Here, where the founders own

approximately 91% of HDR, their $30 million in fines equates to an offset of $27.3 million.[11] The Guidelines fine range should therefore be reduced to between $8.7 million and $44.7 million.

Second, the Company's payments to the CFTC and FinCEN should be credited against the ultimate criminal fine obligation. In the founders' cases, as agreed between the founders and the government, the Court credited each defendant's payment of $10 million to settle the CFTC action alleging violation of the BSA, as applied through the CEA, in full satisfaction of the $10 million criminal fine imposed on that defendant. *See* Hayes Sent'g Tr. 55:20–24 (The Court: "And indeed, the only monetary penalty in this case has already been paid as a result of the CFTC action, and that monetary penalty roughly reflects the amount of pecuniary gain from the offense."); Delo Sent'g Tr. 28:21–23 (The Court: "The defendant's obligation to pay a $10 million fine has been satisfied by his payment of the $10 million penalty to the CFTC."); Reed Sent'g Tr. 23:16–19 (The Court: "There has been disgorgement as a result of the defendant's payment of the $10 million penalty to the CFTC. The penalty also satisfies the fine in this case."). HDR has paid $80 million to settle that same action with the CFTC and a parallel civil action by FinCEN alleging violation of the BSA on the same facts (with an additional $20 million foregone by FinCEN contingent on HDR's satisfactory completion of two undertakings). Therefore, HDR and its founders have paid well more than the fine range suggested by the Guidelines for the BSA offense.

We ask that the Court sentence the Company to no fine beyond the $110 million already paid to the United States by the Company and its founders.

We note that the initial Presentence Report, to which HDR's objections are due on September 10, 2024, finds a gain from the offense of $128 million, based apparently on submissions by the government regarding data produced to the CFTC by HDR. As the Company

---

[11] Messrs. Hayes, Delo, and Reed were the sole owners of HDR until May 2019, and therefore the offset may be larger than $27.3 million.

has explained in detail to the government since 2020, the Company's user data does not map to revenue, and the gain calculation is unsupported.

We also note that the initial Presentence Report wrongly calculates the culpability score for HDR under Guidelines § 8C2.5: it misdescribes HDR as an organization with more than 200 employees when it has never had more than 200 employees, and it proposes denying HDR any acceptance of responsibility credit notwithstanding that HDR pleaded guilty and the government stipulated to acceptance of responsibility reductions for each of the founders. We will address these points with Probation and address them further with the Court should Probation continue in its position.

*(c) 18 U.S.C. § 3553(a) Factors*

Beyond the Guidelines calculations set out above, the prosecution and civil enforcement actions taken to date against HDR and its owners satisfy the goals of sentencing for this offense. Those actions, combined, adequately address all of the § 3553(a) factors—nothing further is required to serve the interests of justice here.

(i) <u>Seriousness of the offense</u>

The BSA offense here is clearly serious: violation of the obligations imposed on financial services businesses operating in the United States can undermine the safety of the financial system and expose it to greater risk of money laundering. HDR has admitted its willful violation of the BSA and accepts that its failure to comply with the BSA may have hindered the United States' efforts to combat money laundering by others. HDR accepts that the violation appropriately brings with it a criminal penalty, measured by reference to the Sentencing Guidelines applicable to the BSA offense.

However, while serious, the BSA offense was not the driver of HDR's economic success. As described above, the business' boom was driven by the founders' invention of the now ubiquitous perpetual contract, their focused marketing in Asia, and the bull market in bitcoin itself. HDR did not simply allow unrestricted trading by any accounts during this boom, nor did it implement "sham" controls as a façade for compliance. During the relevant period, HDR tried, albeit insufficiently, to detect and block U.S. users from BitMEX through a series of real controls that became more advanced over time as HDR's capabilities improved. These controls turned away tens of thousands of potential U.S. users and an estimated over $100 million in revenue. *See* Delo Sent'g Mem. 14, ECF No. 347. This Court has recognized that, though the violation remains serious, the Company did try to screen U.S. users and did forego "a considerable amount of business." Delo Sent'g Tr. 26:8–13. The inadequacy of the controls allowed some U.S. users to trade on BitMEX, including to the knowledge of the founders, and HDR was therefore subject to the BSA. Even so, the U.S. business was not a driver of BitMEX's success, especially when considered with other factors, such as its innovation and strategic marketing to non-U.S. markets, that made BitMEX the top cryptocurrency exchange of its time. The government admits as much, as in *Hayes* it stipulated that the gain from the offense was $10 million per founder, totaling approximately $30 million, while the overall revenue for the business was at least $1.35 billion. The business was not built on the BSA violation, and the punishment carried out to date is sufficient to address the seriousness of the offense.

(ii) <u>Respect for the law and just punishment</u>

Moreover, *Hayes* was the first-ever criminal prosecution of individuals for willful failure to adopt a BSA-compliant KYC and AML program. As a result, the prosecution garnered widespread public attention. The crypto industry, the lay public, and the law firms that advise that

industry all took notice and watched the case closely. *See, e.g.*, Ex. D, Robert Hackett, *Binance CEO: BitMEX indictment is 'wake-up call' for cryptocurrency industry*, Fortune (Oct. 21, 2020), https://fortune.com/crypto/2020/10/21/binance-bitmex-indictment-cryptocurrency-industry/ ("[Binance CEO Changpeng Zhao] said he was surprised to learn that federal prosecutors had taken on BitMEX. The indictment 'is a wake-up call for the rest of the players to be more cautious, to be fully compliant,' he said.");[12] Ex. E, Juan Llanos, *After BitMEX: Regulation Must Change for the Digital Age,* CoinDesk (Oct. 6, 2020), https://www.coindesk.com/policy/2020/10/06/after-bitmex-regulation-must-change-for-the-digital-age/ ("There will, hopefully, be lots of lessons learned here. Not only by the market as to the regulatory obligations applicable to financial players, but by governments with respect to their long-term innovation policy objectives, too."); Ex. F, Turner Wright, *BitMEX charges send 'a message' to global exchanges: Crypto Mom*, CoinTelegraph (Oct. 15, 2020), https://cointelegraph.com/news/bitmex-charges-send-a-message-to-global-exchanges-crypto-mom (quoting Securities and Exchange Commissioner Hester Peirce opining on the DOJ and CFTC charges against BitMEX: "I think that the message has been coming to the industry fairly loud and clear on the AML/KYC front, and I'm sure it will continue."); Ex. G, *CFTC and DOJ Actions Against Off-Shore Cryptocurrency Derivatives Exchange*, Skadden, Arps, Slate, Meagher & Flom LLP (Oct. 2020), https://www.skadden.com/insights/publications/2020/10/the-distributed-ledger#cftc ("An important refrain in recent regulatory guidance—and a central theme in the BitMEX case—is that those companies and individuals that operate, or provide services to customers, in the United States will be subject to the reach of U.S. regulators, regardless of where they are based.").

---

[12] Perhaps ignoring his own crystal ball, Zhao pled guilty to a BSA violation that occurred through the Binance cryptocurrency exchange. Plea Agreement, United States v. Zhao, No. 2:23-cr-00179-RAJ (W.D. Wash. Nov. 21, 2023), ECF No. 31 (Zhao); Plea Agreement, United States v. Binance Holdings Ltd., No. 2:23-cr-00178-RAJ (W.D. Wash. Nov. 21, 2023), ECF No. 23 (Binance).

As evidenced by such press and legal commentary, the very precedent-setting nature of the prosecution already completed against the individual defendants promotes respect for the law and has shown that failure to comply with the BSA can lead to jail, serious fines, and damaged businesses.

The punishment already meted out to the individual defendants and the Company is serious: the Company has settled actions that allege its conduct in great detail, has paid $80 million directly, another $30 million through its owners, and faced a contingent $20 million in further penalties. And the Company has admitted its misconduct to this Court. Whether measured by the Guidelines or by common sense, the punishment to date has been sufficient.

(iii) Deterrence

Whether considering specific or general deterrence, the prosecution and enforcement actions taken to date have sent a clear message: failure to comply with the BSA risks jail, fines, and a crippled business reputation. The founders themselves are deterred: they avoided prison and, as they each expressed to the Court, regret and are chastened by the experience. Hayes Sent'g Tr. 42:23–24 (Mr. Hayes: "I will always have to live with the consequences of these actions."); Delo Sent'g Tr. 19:21–25 (Mr. Delo: "I did not act quickly enough or effectively enough to ensure that we were not serving U.S. customers. It was a terrible decision, the consequences of which I have to carry the rest of my life."); Reed Sent'g Tr. 18:1–6 (Mr. Reed: "This was a mistake. We didn't do enough to ensure that we were not serving U.S. customers, and the result of that has been clear. It's why we're all here today. I deeply regret this mistake. Not only was it wrong, but it's had an enormous effect on others, including my business, my family, and my friends."). Their Company is equally chastened. It has remediated its KYC and AML processes, ensured that it does not

operate in the United States, and has suffered an enormous blow to its business fortunes. It has taken the lesson to heart.

(iv) <u>To protect the public from further crimes of the defendant</u>

And finally, the Company is no threat to the public. As described in Section 4 above regarding HDR's full remediation and as confirmed by the Guidehouse review mandated by FinCEN, the Company's controls are "effective" and "strong" to ensure that no U.S. person can trade on BitMEX. *See* Ex. A at 4; Ex. B at 4. FinCEN and the CFTC are satisfied that the Company is operating outside the United States. No further penalty is required to ensure public safety.

(v) <u>To avoid unwarranted sentencing disparities</u>

Section 3553(a)(6) further notes the need to avoid unwarranted sentencing disparities among defendants with similar records and convicted of similar misconduct. Here, while HDR is an entity and therefore subject to different Guidelines and considerations, the charge at issue remains the same as the charge against Messrs. Hayes, Delo, Reed, and Dwyer. There is no allegation that the Company engaged in any misconduct that was not part of *Hayes*—the Company accepted its liability for the conduct of those individuals and that is the entire case against HDR. As the conduct at issue is identical, the consequences should align.

## 6. IRRELEVANT ALLEGATIONS OF FALSE STATEMENTS TO A FINANCIAL INSTITUTION

The government has included in the Information allegations that HDR made false statements to a foreign financial institution, allegedly to obtain a bank account for use in connection with operating the BitMEX platform. *See* Information, *United States v. HDR Glob. Trading Ltd.*, 1:24-cr-00424-JGK (S.D.N.Y. July 10, 2024), ECF No. 1. Indeed, the government relied on those allegations in connection with the sentencing of Mr. Hayes, Mr. Delo, and Mr. Dwyer on their BSA convictions, Gov't Sent'g Mem. for Hayes, ECF No. 334 at 6–7, 12, Gov't

Sent'g Mem. for Delo, ECF No. 351 at 6–7, Gov't Sent'g Mem. for Dwyer, ECF No. 421 at 4–5, 6–7, and the Court declined to consider those unproven allegations at sentencing when imposing guidelines sentences, *see* Hayes Sent'g Tr. 54:15–18 (The Court: "[T]he government chose not to accuse the defendant of money laundering or fraud, like the charges in some other cases on which the government relies for its plea for an upward variance."), Delo Sent'g Tr. 26:14–16 (The Court: "[T]he government chose not to accuse the defendant of money laundering or fraud, although the government points to these offenses in its sentencing memo."), Dwyer Sent'g Tr. 12:16–17 (The Court: "It's not a charge of fraud. It's a charge of willful violation of the Bank Secrecy Act.").

The Company spent 16 months arguing with the government concerning whether the alleged bank account conduct, assuming it occurred, made out any offense. The account at issue was obtained in Hong Kong by an affiliate of HDR in 2015, based on representations that the government believes to have been incorrect or incomplete. Once the account was open, the affiliate deposited its own and HDR's funds into the account and paid business expenses from it. No customer funds ever entered that account. Thus, assuming for the sake of argument that the account was obtained by fraud, it is use of the account itself that was the object of any scheme, and not customer funds or any funds at all. The use-of-account-as-property object does not suffice after *Ciminelli v. United States*, which held that "the right-to-control theory is not a valid basis for liability" because "'potentially valuable economic information' 'necessary to make discretionary economic decisions' is not a traditional property interest." 598 U.S. 306, 309 (2023). After the *Ciminelli* decision and after considerable argument between HDR and the government over its application to this matter, the government declined to bring any charge concerning the bank account.

The government's inclusion of the bank account facts in the Information is of a piece with its insistence that HDR be prosecuted for the BSA violation: the latter is driven by its dissatisfaction with the sentences imposed by this Court on the individual defendants, which in turn is driven by its belief that the BSA conduct should be treated differently by the law than the law provides; the government included the bank account facts in the Information despite their utter irrelevance to the BSA charge because it wishes the law recognized the right to control theory of property and is unwilling to adjust its actions in the face of judicial rulings, even by the Supreme Court.

This Court should place no weight on the bank account allegations. They are denied. They do not make out any offense within the jurisdiction of this Court. And they are wholly irrelevant to the offense before the Court.

## 7. CONCLUSION

For the reasons set forth above, the Company respectfully requests that the Court impose a sentence of no fine beyond the $110 million already paid to the government by the Company and its founders.

Dated: New York, New York
September 6, 2024

Respectfully submitted,

David Esseks /MWS

David C. Esseks
Eugene Ingoglia
Melinda Bothe (admitted *pro hac vice*)
Megan Sharkey
ALLEN OVERY SHEARMAN
STERLING US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel: (212) 610-6300
*david.esseks@aoshearman.com*
*eugene.ingoglia@aoshearman.com*
*melinda.bothe@aoshearman.com*
*megan.sharkey@aoshearman.com*

*Attorneys for Defendant HDR Global Trading Ltd.*