UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

v.

HDR GLOBAL TRADING LIMITED,

*Defendant*.

Case No. 24-cr-00424 (JGK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**REPLY SENTENCING MEMORANDUM ON BEHALF OF HDR GLOBAL TRADING LTD**

A&O SHEARMAN
ALLEN OVERY SHEARMAN
STERLING US LLP
599 Lexington Avenue
New York, NY 10022

David Esseks
Eugene Ingoglia
Melinda Bothe
Megan Sharkey

*Attorneys for Defendant HDR Global Trading Ltd.*

September 25, 2024

**TABLE OF CONTENTS**

1. PRELIMINARY STATEMENT ........................................ 1

2. THE GOVERNMENT SHOULD BE HELD TO THE STIPULATED $30 MILLION GAIN ........................................ 3

3. THE GOVERNMENT'S ATTEMPT TO PROVE A LARGER GAIN FAILS ................ 6

(a) The Company's Data ........................................ 7
i. The User Table ........................................ 8
ii. The User Events Table ........................................ 9
(b) The 2020 User Data Spreadsheets ........................................ 10

4. THE COMPANY'S CULPABILITY SCORE SHOULD BE SIX ................................ 16

(a) §8C2.5(b)(3) – Number of Employees ........................................ 16
(b) §8C2.5(g)(3) – Acceptance of Responsibility ........................................ 18

5. NO ADDITIONAL DISGORGEMENT IS REQUIRED ........................................ 20

6. JUSTICE IS DONE WITH A FINE OF NO MORE THAN $110 MILLION ................. 21

(a) Seriousness of the Offense ........................................ 21
(b) Need to Avoid Unwarranted Sentencing Disparities ........................................ 23
(c) Deterrence ........................................ 26

7. CONCLUSION ........................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*U.S. Dep't Treas. v. U.S. Bank Nat'l Ass'n*,
No. 18 Civ. 1358 (S.D.N.Y. Feb. 15, 2018) ........ 23

*United States v. Electrodyne Sys. Corp.*,
147 F.3d 250 (3d Cir. 1998)........ 18

*United States v. Binance Holdings Ltd.*,
23 Cr. 178 RAJ (W.D. Wash. Nov. 14, 2023) ........ 24

*United States v. Hayes*,
No. 20-cr-500-JGK (Oct. 1, 2022)........ *passim*

*United States v. Hingorani*,
No 4:13-cr-00049 (S.D. Iowa May 30, 2013)........ 18

*United States v. Juwa*,
508 F.3d 694 (2d Cir. 2007)........ 6, 14

*United States v. Zhao,*
23 Cr. 179 RAJ (W.D. Wash. Nov. 14, 2023) ........ 25

**Other Authorities**

Crystal Kim, *Crypto Firms Poised to Spend More on Compliance*, Axios (Jan. 9, 2023),
https://www.axios.com/2023/01/09/crypto-spending-compliance ........ 27

Mohammad Shahidullah, *OKX Repositions US Compliance Team as Highest Priority*,
Crypto.News (Mar. 28, 2024), https://crypto.news/okx-repositions-us-compliance-team-as-highest-priority/ ........ 27

Press Release, U.S. Att'y's Off., S.D.N.Y., *Manhattan U.S. Attorney Announces Criminal Charges Against U.S. Bancorp For Violations Of The Bank Secrecy Act*
(Feb. 15, 2018), https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-criminal-charges-against-us-bancorp-violations-bank........ 23, 24

Press Release, U.S. Att'y's Off., S.D.N.Y., *Commerzbank AG Admits to Sanctions and Bank Secrecy Violations, Agrees to Forfeit $563 Million and Pay $79 Million Fine*
(Mar. 12, 2015), https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and ........ 24

Press Release, U.S. Att'y's Off., S.D.N.Y., *Founder And CEO Of Off-Shore Cryptocurrency Derivatives Platform Sentenced For Violating The Bank Secrecy Act*
(May 20, 2022), https://www.justice.gov/usao-sdny/pr/founder-and-ceo-shore-cryptocurrency-derivatives-platform-sentenced-violating-bank........ 4

*Thomas Hook Joins Bitstamp as U.S. Chief Compliance Office*r, Bitstamp (June 9, 2021), https://blog.bitstamp.net/post/thomas-hook-joins-bitstamps-as-u-s-chief-compliance-officer/ ........ 27

U.S. Sent'g Guidelines Manual (U.S. Sent'g Comm'n 2023) ........ *passim*

Yogita Khatri, *Deribit to Mandate ID Verification For All Traders Before the End of the Year*, The Block (Oct. 21, 2020), https://www.theblock.co/post/81874/deribit-crypto-derivatives-verification-2020 ........ 27

HDR Global Trading Limited ("HDR" or the "Company") respectfully submits this reply memorandum in advance of the sentencing scheduled for October 7, 2024.

## 1. PRELIMINARY STATEMENT

The Court can see clearly that the parties have very different views of what justice requires in this matter. The defense view is simple: The conduct was seriously wrong, it has been addressed appropriately through sentencing of the individuals responsible, through resolution by the Company of regulatory enforcement actions, through remediation by the Company to ensure no continuing violations, and now through the public acknowledgement by the Company of its criminal responsibility. But, applying both the law of sentencing and common sense, no further monetary penalty is required to meet the goals of sentencing: The harm has been addressed, remediation accomplished, and punishment imposed. And the message of this prosecution is clear: Those who operate financial institutions touching the United States must comply with the Bank Secrecy Act ("BSA") or risk jail, serious fines, civil enforcement actions, reputational damage, and destruction of otherwise successful businesses. All of that has already happened to HDR, its founders and their BitMEX business. Nothing more is required or appropriate to meet the goals of sentencing.

The government, on the other hand, brought the case against HDR because it is dissatisfied with the sentences imposed on the individual defendants. Sure, the Company asked the government on the day the individual indictments were unsealed whether there was a charge against the Company itself, and the government said that though no charges had been filed, prosecution of the entity was possible. But the chronology is clear: 20 months later, the government for the first time sought a presentation from the Company on why it should not be

prosecuted, a mere three weeks after it was rebuffed by this Court in its effort to have Mr. Hayes put in jail.

The question for the Court, we submit, is straightforward: What aim of sentencing has not been met in this case already? The government's response, beyond trying to punish the individual defendants further through their entity, is a syllogism: corporate prosecutions need to result in penalties beyond the individual; we are prosecuting HDR; therefore an additional penalty is required. But the conclusion does not follow here, where the entity before the Court is no ordinary corporate entity with an existence independent of those who act on its behalf and who may commit crimes for its benefit. The Guidelines themselves recognize that the punishment of individual owners of a closely-held entity should reduce the size of any penalty to be imposed on the entity for the same offense. *See* U.S.S.G. §8C3.4. And the government and the Court in this case have agreed that the criminal fines are appropriately satisfied with the same money used to settle the companion charges with the U.S. Commodity Futures Trading Commission (the "CFTC"). So where the Company and its founders have already paid the United States substantially more than the Guidelines suggest by way of a fine for the BSA violation, there is no need for any further financial penalty.

In its pursuit of its further pound of flesh, the government makes assumptions about gain from the offense but offers no evidence, argues that HDR should be punished further because the sentences for Messrs. Hayes, Delo, and Reed did not (in the government's view) deter others from committing crimes, and relies on comparisons to wholly inapposite prosecutions for violations beyond the BSA and on facts wildly different from those at issue here.

Throughout its submission, the government makes arguments but does not accurately cite or meaningfully discuss the extensive evidentiary record that was developed in this matter. Below

and in annexed exhibits, we demonstrate that the evidence does not support the government's sentencing arguments. The government has not met its burden to establish gain beyond the $30 million to which the founders agreed and that the government represented to the Court, and justice does not require any further financial penalty for HDR's admitted offense.

## 2. THE GOVERNMENT SHOULD BE HELD TO THE STIPULATED $30 MILLION GAIN

The government agreed with the individual defendants on $10 million fines for each. To justify the fines under 18 U.S.C. § 3571(d), the government told the Court that the amounts "represent[ed] pecuniary gain derived by the defendant from the offense." Hayes Plea Agreement at 2, *United States v. Hayes*, No. 20-cr-500-JGK (Feb. 18, 2022); Delo Plea Agreement at 2, *Hayes*, No. 20-cr-500-JGK (Feb. 18, 2022); Reed Plea Agreement at 2, *Hayes*, No. 20-cr-500-JGK (Mar. 9, 2022).

More than two years later, the government says that it meant the fine approximated the gain to the individual defendants looking only at the profits they took out of the Company. Gov't Sent'g Mem., 14–15, ECF No. 18. But the government did not tell the Court that at the time. And given that Messrs. Hayes, Delo, and Reed own 91% of HDR (and during the majority of the relevant period owned 100%), their gain from the offense is the same whether they took all the profits out of the Company immediately, left them all in, or did a bit of both. With hindsight, it appears that the government may have deliberately sought to preserve its ability to argue for a greater gain figure for the Company later. Hence the careful language with no definite article: "represent[s] pecuniary gain derived by the defendant from the offense." Hayes Plea Agreement at 2; Delo Plea Agreement at 2; Reed Plea Agreement at 2. But the government's press release after Hayes's sentencing was perfectly clear:

> Hayes, 36, of Miami, Florida, was sentenced to six months of home detention and two years of probation. Hayes also agreed to pay a fine of $10 million dollars representing *his* pecuniary gain from the offense.

Press Release, U.S. Att'y's Off., S.D.N.Y., *Founder And CEO Of Off-Shore Cryptocurrency Derivatives Platform Sentenced For Violating The Bank Secrecy Act* (May 20, 2022), https://www.justice.gov/usao-sdny/pr/founder-and-ceo-shore-cryptocurrency-derivatives-platform-sentenced-violating-bank (emphasis added).

And the Court understood that the pecuniary gain that warranted the $10 million in fines was not some of the gain, but was "the" gain:

> The Court: "Mr. Hayes, do you agree that the $10 million in United States currency represents the pecuniary gain derived by you from the offense?"
>
> Mr. Hayes: "Yes."

Hayes Plea Tr. 20:7–10, *Hayes*, No. 20-cr-500-JGK (Feb. 24, 2022), ECF No. 302.

> The Court: "There has been disgorgement of the alleged monetary gain through the payment of the penalty as a result of the CFTC case."

Hayes Sent'g Tr. 55:1–3, *Hayes*, No. 20-cr-500-JGK (May 20, 2022), ECF No. 342.

> Chief Judge Swain: "Do you agree that $10 million appropriately represents the pecuniary gain derived by you from the offense?"
>
> Mr. Reed: "Yes, your Honor."

Reed Plea Tr. 21:5–8, *Hayes*, No. 20-cr-500-JGK (Mar. 9, 2022), ECF No. 314.

> The Court: "There has been disgorgement as a result of the defendant's payment of the $10 million penalty to the CFTC."

Reed Sent'g Tr. 23:16–18, *Hayes*, No. 20-cr-500-JGK (July 13, 2022), ECF No. 396.

> The Court: "There has been disgorgement as a result of the payment of the $10 million CFTC penalty."

Delo Sent'g Tr. 26:18–19, *Hayes*, No. 20-cr-500-JGK (June 15, 2022), ECF No. 380.

Not once during these proceedings did the government lawyers, in the face of the Court's clear understanding that the fines were based on the pecuniary gain realized by the defendants from their offenses, speak up to say that $10 million was just *part* of the gain.

When HDR argued in its opening submission that the government stipulated to the gain amount, it was not contending, as the government suggests, that somehow the government had agreed with HDR on the gain amount. It was that the government had previously represented to the Court the gain that each defendant reaped from the offense. It is unclear whether the government changed its mind on the size of the gain once it turned its attention to prosecuting the Company, or planned this all along and was happy to leave the Court confused regarding the basis for the fines it imposed on the individuals. Neither option is attractive. Regardless, the government cannot now claim that it meant something different, something that ignores the ownership of the Company by Messrs. Hayes, Delo, and Reed, and something that it never mentioned to the Court.

The Court should hold the government to its representations about gain. The individual defendants agreed to the $10 million fines because, as they each told the Court, those amounts roughly approximate the gain to them from the BSA offense. *See* Hayes Plea Tr. 20:7–10; Delo Plea Tr. 21:2–4 *Hayes*, No. 20-cr-500-JGK (Feb. 24, 2022), ECF No. 304; Reed Plea Tr. 21:5–8. As set out below, the government has not met its burden to show any particular gain from the offense, and certainly not any gain beyond the $30 million it has previously represented to the Court.

**3. THE GOVERNMENT'S ATTEMPT TO PROVE A LARGER GAIN FAILS**

The government has failed to meet its burden of proof regarding gain from the offense. It first ponders alternate gain theories that are indefensible,[1] then adopts the only methodology that can assess gain from this offense: profit from U.S. users.[2] *See* Gov't Sent'g Mem., 11–14. But the data on which the government relies does not support its claim of a larger-than $30 million gain from the offense. Indeed, the government has not submitted a single piece of evidence to the Court in support of its position on gain, and when we examine the materials it references but has not submitted, we find that they do not show what the government represents. The government also attempts to shift the burden to HDR: "BitMEX has made no attempt to calculate an alternative number, despite the fact that the Company would presumably be uniquely able to produce granular user and transaction data to more precisely estimate the revenue attributable to U.S. users if it thought such a calculation would be to its advantage." *Id.* at 12–13. The government bears the burden to prove gain from the offense. *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007). It has not met that burden.

---

1 The first approach says gain from the offense is the total revenue the Company earned anywhere, Gov't Sent'g Mem., 11, but the violation is operating the business in the United States without complying with U.S. AML requirements—the business outside the U.S. cannot violate the BSA and therefore gain from that business cannot be gain from the offense. The second approach is that gain from the offense is the revenue earned because of the Company's lack of KYC during the charged period. *Id.* at 13–14. As the government notes, it is an impossible task to determine which users signed up because they did not have to provide identifying information, and even if that were done, such users outside the U.S. would not make out a violation of the BSA and hence their revenue could not be gain from a BSA violation. *See id.* Despite the tone of its submission, the government is not conceding anything by foregoing these approaches to gain from the offense.

2 It is striking that even then the government advocates for a fine range well beyond the figure that it apparently submitted to Probation. *Compare* Draft PSR ¶ 84 (gain of $128 million and fine range of $205,416,000 to $410,832,000) *with* Gov't Sent'g Mem., 2 ($223,416,000 to $428,832,000). It is further striking that the government accepts in its submission to Probation that set off should be applied for the $110,000,000 of penalty and disgorgements already paid by the Founders and the Group so far, but in its 20 September submission has not proposed any such set-off.

(a) *The Company's Data*

Given that the Company did not obtain full Know-Your-Customer ("KYC") data from its users until 2020 (the essence of the BSA offense), the Company's structured data does not readily establish which user was in which country when trading on the platform, and hence revenue from U.S. users cannot reliably be calculated from this data. The government's approach is to attempt to establish the number of U.S. users who ever traded on BitMEX, and then to assume that U.S. user revenue is equal to the percentage of U.S. users who ever traded on the platform multiplied by the overall revenue of the platform. That approach is flawed because (1) the government's starting point (number of U.S. users who ever traded) lacks any reliable evidentiary support, and is not supported by the government's data and (2) the government's proposed linear extrapolation methodology is speculative at best. When the data we believe the government is relying on is understood and properly assessed, the gain from the offense is wholly uncertain and cannot support the government's proposed gain of more than $30 million.

BitMEX's revenue consists of commissions paid by users on each trade.[3] The trade commission information is kept in an engine database, Tehan Decl. ¶ 9, but the trades are not readily connected through structured data to a user in a particular location, so that database does not answer the question how much revenue was obtained from trades directed from the U.S. Instead, the government's argument relies on its interpretation of certain data that HDR produced to the CFTC in January 2020 (the "2020 User Data Spreadsheets") that reflect different types of connections of certain users to the U.S. at different points in time.[4] That production consisted of

3 The term "user" refers to anyone who established an account at BitMEX, but it is not synonymous with customers who actually traded on the platform. As the record demonstrates, it was possible to establish an account on BitMEX without ever trading, and this was common. *See* Delo Sent'g Mem. Ex. I, *Hayes*, No. 20-cr-500-JGK (June 1, 2022), ECF No. 347.

4 These spreadsheets are available as Exhibits A–C to the Declaration of Julian Tehan.

three spreadsheets collecting slices of data from two structured tables of data about users on BitMEX: the "User Table" and the "User Events Table." We first need to explain the contents of those tables, and then the content of the spreadsheets drawn from the tables.

(i) The User Table

The User Table records certain information regarding every user who ever signed up to an account on BitMEX, regardless whether any trading occurred from that account. Tehan Decl. ¶ 4. The User Table includes information such as the account ID, the user's registered email address, and the date of account creation. *Id*. The User Table is dynamic: The data populated in the fields for each user can change over time, and each field has only one value at any given time, so any snapshot of the User Table will reflect the data as it appeared only on the date of that snapshot. *Id*. The User Table has two fields that attribute country information to user accounts: the "Country" field and the "Geoipcountry" field, each explained below:

- The "Country" field reflects the "country of residence" assigned to the account and can be populated in three ways:[5] (1) the user could self-select its country of residence at account creation; (2) if the GeoIP check at account registration detected that a user had a U.S. IP address when creating an account, an HDR control would automatically populate the "Country" field with the U.S.; or (3) if BitMEX customer support determined, for example through communications with a user, that a particular user appeared to be in the U.S., then customer support would manually change that user's "Country" field to the U.S. Tehan Decl. ¶ 5. The "Country" field in the User Table served as a trigger for HDR's controls to restrict apparent U.S. users on BitMEX; if

[5] With full KYC in place since December 2020, this field now reflects every user's verified country of residence, as demonstrated through identification and residency documentation. *See* Tehan Decl. ¶ 5.

this field was set to the U.S., then restrictions automatically applied to that account.[6] *Id*. During the charged period, users could remove such restrictions only by contacting customer support and completing the KYC process in place at that time to demonstrate they were not in the U.S.[7]

- The "Geoipcountry" field reflects the country detected by the GeoIP check at the user's last recorded login. Tehan Decl. ¶ 6. In June 2018, HDR turned this field "sticky" such that once a U.S. IP was detected at login, the Geoipcountry field retained the U.S. country code even after a subsequent login from a different location. *Id*. ¶ 7. This "sticky" functionality was another step in HDR's expansion of its controls to restrict apparent U.S. users on BitMEX. By December 2018, any user who logged into its account with a U.S. GeoIP, thereby freezing its "Geoipcountry" field with the U.S. country code, was automatically restricted from trading. *Id*. ¶ 8.

(ii) The User Events Table

The "User Events Table," in contrast, consists of a running log of certain events for every user, including every account login, and, for each event captured, a record of the affiliated GeoIP information. HDR created the User Events Table on August 29, 2018, as part of its evolving account security and user controls. *Id*. ¶ 4.

---

6 From around October 2015, if a user's "Country" field was set to the U.S., the user was unable to obtain a deposit address for BitMEX (users who already had a deposit address could still deposit Bitcoin if they saved that address elsewhere.) Tehan Decl. ¶ 5. By July 21, 2018, this control was expanded to also restrict trading: if "Country" was set to U.S. the user was automatically restricted from opening new positions or increasing the size of those positions (users could still close existing positions). *Id*. To remove these restrictions, a user could complete KYC to verify that they were a non-U.S. person who resided outside of the U.S. *Id*.

7 Unlike the current KYC program, which is mandatory for all users, the KYC in place before 2020 was reactive; it was only a requirement if a user had triggered one of HDR's controls.

*(b) The 2020 User Data Spreadsheets*

The 2020 User Data Spreadsheets on which the government apparently relies contain information drawn from the User Table and the User Events Table. Tehan Decl. ¶ 10. These spreadsheets were produced in response to a request for documents concerning any U.S. customer and, as detailed below, provided three slices of data that reflected some connection between a user and the U.S.

The first spreadsheet identified all registered users who, on January 15, 2020, had their User Table "Country" field populated with a U.S. country code. *Id*. ¶ 11. There were 50,498 users on that spreadsheet, 759 of which had ever traded on BitMEX. *Id*. Ex. A.[8] As of that same date, the Company had a total of 509,853 registered users who had ever traded, *Id*. ¶ 11, and thus the first group of potential U.S. users made up 0.15% of the Company's total user base with trade activity at some point during the lifetime of their account history on BitMEX.

The second spreadsheet identified all registered users who, on January 15, 2020, had their User Table "Geoipcountry" field populated with a U.S. country code, excluding any users who appeared on the first spreadsheet. *Id*. ¶ 12. This second slice of the 2020 User Data Spreadsheets therefore reflects all registered users whose last recorded login was apparently from the U.S., or who had logged in apparently from the U.S. at some point after the "sticky" GeoIP feature was enabled around June 2018, and who did not subsequently complete KYC to get unrestricted (*i.e.* via the manual clearing of the "Geoipcountry" field by Customer Support to release the controls). There are 41,636 users on this second spreadsheet, 24,973 of whom ever traded at least once on

---

[8] The discrepancy between these numbers shows that nearly 50,000 individuals from the first spreadsheet established accounts on BitMEX (and were therefore "users") but never traded, even once, on the platform.

BitMEX.[9] Tehan Decl. Ex. B. Of the 509,853 registered users who had ever traded on BitMEX as of January 15, 2020, the second spreadsheet thus reflects that 4.9% had a last "Geoipcountry" value of U.S.

The third spreadsheet identified all registered users who were recorded in the User Events Table as having had at least one account login with an IP address from the U.S. at some point after August 2018 (when the User Events Table was created), excluding any users who appeared on the first and second spreadsheets. *Id.* ¶ 12. This third spreadsheet contains 27,006 users in total, of whom 22,761 ever traded. *Id.* Ex. C. Those 22,761 users represent 4.5% of all users who ever traded at least once on BitMEX. The government appears to have simply summed the three spreadsheets to arrive at its estimate of 9.51% apparent U.S. users who ever traded.

Any clear understanding of these spreadsheets reveals that they do not establish how many BitMEX users traded from the United States over time, and hence the linear extrapolation assumed by the government does not follow: the spreadsheets establish only that as many as 9.51% of all users who ever traded on BitMEX as of the date of that data snapshot had at least one U.S. touchpoint ever, namely a self-identification as located in the U.S. (a tiny portion) or at least a single GeoIP connection to the U.S. (most of the data set).[10] That does not support an extrapolation

---

9 We note that GeoIP data is, at best, a flawed method of determining a user's actual geographic location, especially for BitMEX, which focused its business development and marketing efforts on the China market. During the relevant time period, it was common for users in China to use a VPN reflecting a U.S. IP address to bypass the "Great Firewall of China." *See infra* at 11. The Great Firewall of China is a longstanding program of the Chinese government to restrict access to foreign Internet sites for Chinese residents. *See* https://cs.stanford.edu/people/eroberts/cs181/projects/2010-11/FreeExpressionVsSocialCohesion/china_policy.html; https://www.internetsociety.org/resources/internet-fragmentation/the-chinese-firewall/?gad_source=1&gclid=EAIaIQobChMI1qi8r5_eiAMVl0xHAR2eNh2fEAAYASAAEgL3DPD_BwE.

10 The counsel letter that accompanied the production of this data to the government described the nature of each spreadsheet and expressly noted that the information contained therein did not identify the geographic location from which trading had occurred. *See* Tehan Decl. ¶ 12 n.2.

that 9.51% of the revenue of the Company over the six-year period of the charged offense was from U.S. users.

For example: The first spreadsheet, which reflects self-identified or control-detected U.S. users as of January 15, 2020, does not show how the user self-identified at any point other than on that date, so an inference that any trading that user carried out in the past was from the U.S. is limited at best and speculative at worst.

The second spreadsheet, which reflects users with last-recorded U.S. logins, shows only that those users using a U.S. GeoIP address (which, as noted, does not mean they were physically in the United States) at some point after the "sticky" control was in place in June 2018. But any U.S. GeoIP login after December 2018, when the trade restriction by GeoIP check at login was implemented, would have triggered an immediate trading ban. Thus, the data could map at most to potential trading between June and December 2018 by a user who may—or may not—have been physically present in the United States at the time of a single login using a U.S. IP address. The data equally says nothing about from where any trades originated that occurred before the triggering U.S. login.

The third spreadsheet, which reflects any user not in either of the first two spreadsheets who had at least one event logged in the User Events Table from a U.S. GeoIP, also fails to establish from where any user traded on any particular day. The data simply reports whether that user ever, once, had a U.S. GeoIP; it says nothing about how much, if any, of the trading for that user occurred from the U.S. Examples of false positives abound:[11]

[11] We include Exhibits B–K to the Declaration of David Esseks to provide examples of Customer Support communications that evidence users who accidentally triggered the U.S. user controls and needed to unlock their accounts.

- Users from non-U.S. countries who logged into their BitMEX account while vacationing or interning in the U.S. (for the latter, customer support kept the account disabled until the user returned home). Esseks Decl. Exs. B, F;
- Users in non-U.S. countries who mistakenly logged into their BitMEX accounts while using a U.S. VPN to watch Netflix. *Id*. Exs. D, H;
- Users in non-U.S. countries who logged into their BitMEX accounts while using in-flight internet. *Id*. Exs. C, K; and
- Most significantly, large volumes of Chinese users who were known by the Company to use U.S. VPNs to bypass Chinese restrictions and trade on BitMEX. *Id*. Exs. E, G, I, J. China was a strategic growth market for HDR, as described in HDR's submission and in the sentencing submissions for its founders in Hayes. *See* HDR Sent'g Mem., 5–6 n.6, ECF 15; Hayes Sent'g. Mem. 8, *Hayes*, No. 20-cr-500-JGK (May 4, 2022), ECF No. 327; Delo Sent'g Mem., 11, *Hayes*, No. 20-cr-500-JGK (June 1, 2022), ECF No. 347. In relying on this slice of data, the government is asking the Court to dismiss HDR's legitimate efforts to target a large, non-U.S. market simply because many users from that country logged in with a U.S. VPN, which littered the data with false positives.

Notably the users on this third spreadsheet do not have their "GeoIP field" populated to the U.S. (or else they would appear on the second spreadsheet), which means that each of the users on this list either logged in from the U.S. before the "sticky" control was implemented in 2018 but not again thereafter, or logged in from the U.S. after the "sticky" control was implemented and then successfully completed KYC to prove they were not resident in the U.S. In the latter case the

user was not a U.S. user; in the former case the U.S. touchpoint was from before 2018 and is not an indication that any proportionate amount of trading occurred from the U.S. over time.

In short, the 2020 User Data Spreadsheets do not establish that 9.51% of the users on BitMEX were "U.S. users," much less that 9.51% of HDR's total revenue over the charged period came from trading by U.S. users. The government has failed to carry its burden to reliably establish the gain from the offense. *Juwa*, 508 F.3d at 701.

The government then posits that the unsupported 9.51% figure is likely an "underestimate" for two reasons: because "BitMEX's U.S. users included some of its most highly active traders from whom BitMEX earned substantial fees, including high-profile U.S.-based crypto trading firms known to trade in huge volumes," and because "internal Company documents showed that the United States was the Company's single largest country by number of active users for at least substantial portions of the charged time period. (Hayes PSR ¶ 21)." Gov't Sent'g Mem., 12.[12] Once again the evidence is to the contrary.

The Probation Office uses the same language about "high-profile U.S.-based crypto trading firms" to raise the same concern that the 9.51% understates the significance of U.S. users to BitMEX revenue. It goes on to identify three firms in particular, Alameda Research, Jump Trading, and Hudson River Trading. Draft PSR ¶ 28. But each of those firms had offices outside the U.S. and represented to HDR that their trading was done from outside the U.S.; they were therefore not U.S. users. From May 2018, HDR required corporate users to attest in writing that all trading decisions were made outside of the U.S. A number of corporate users had back-office

---

12 Throughout its submission, the government cites to presentencing reports for the individual defendants, rather than to the PSR for the Company. That is a curious practice where the government is contending that the Company should be punished separately from the individuals, and is especially difficult where the Probation Office has, rightly, not communicated those PSRs to the Company. Nevertheless, the Company believes it understands the document to which the government has referred.

and compliance functions that were based in the U.S., even if the trading entity and its traders were outside of the U.S. For this reason, some corporate users may have had a login from a U.S.-based IP address even though the trading entity was not U.S.-based and did not trade from the U.S. Specifically, the Company required onboarding documentation and a signed representation from corporate customers, which provided that the customer "represents and certifies to BitMEX that (1) it is not a U.S. entity or a U.S. resident, and (2) it does not conduct business operations related to engaging in transactions on BitMEX from within the United States," or "or (2) it conducts no business, other than back office functions, related to engaging in transactions on BitMEX from within the United States." Jump Crypto signed this representation on May 21, 2018 through its onboarded offshore entity TMS International; Hudson River Trading signed the representation on May 31, 2018 through its onboarded offshore entity HRTJ Limited; and Alameda Research signed the representation on December 14, 2018. All of these documents were produced to the government and are submitted to the Court as Exhibits L–N to the Declaration of David Esseks. Moreover, the government's logic is faulty: the professional trading operations were typically providing liquidity to the platform and hence received "maker" fees from HDR rather than paying "taker" fees to HDR. However high the volume of trading, these (non-U.S.) customers did not pay HDR anything on most of their trades. So the presence of "high-profile U.S.-based crypto trading firms" has not been proven, and the firms cited by the Probation Office were not in the U.S. and did not contribute revenue to HDR. This is no reason to consider the 9.51% figure (which is denied and for which the government has failed to provide any justification) to be understated.

The second point concerns an internal "Analytics Report," prepared by HDR employee Greg Dwyer in mid-2017 to track activity on the BitMEX website, such as website visits, new account signups, first deposits, and account logins, for business development purposes. Esseks

Decl. Ex. A. The report observes that the "United States remains as the most popular Country by visits and average number of active users per day." *Id*. at BMX-SDNY-10329181. The accompanying table shows website traffic from the U.S. (visits to the website) at 16% of total visits as of April and May 2017. It shows an average of 277 active users from the U.S. in the same months. *Id*. Elsewhere, the document reports total active users in May 2017 to be 10,442. *Id*. at BMX-SDNY-10329178. Taking the document at face value, then, the active users in the U.S. in May 2017 were 2.6% of the total. That is hardly a sign that the 9.51% relied on by the government (and undermined above) is an "underestimate" of the size of the U.S. user population. The government has misread the evidence again.

**4. THE COMPANY'S CULPABILITY SCORE SHOULD BE SIX**

The Company's culpability score, which is used to determine the multipliers for a Guidelines calculation, should be six. The government contends that the score should be eight, as it counts an extra point under §8C2.5(b)(3) for an organization with 200 or more employees and culpable high-level personnel, and proposes denying HDR a one-point reduction under §8C2.5(g)(3) for acceptance of responsibility. We disagree, for the reasons set out below.

*(a) §8C2.5(b)(3) – Number of Employees*

We have submitted a declaration from the Head of People at HDR, setting out in detail the history of the Company's hiring of employees and contractors. At no time during the charged period did the Company have more than 200 employees. Davidson Decl. ¶ 5. In support of its contrary position, the government cites to a list produced by HDR in February 2019 of users on the Company's Slack communications platform. *See Id*. Ex. A. The government notes that that document identifies "209 separate individual user identifications," and that, "[a]s far as the Government is aware, only BitMEX employees had access to the Slack space, meaning that it had

approximately 200 employees at that time." Gov't Sent'g Mem., 16. But that document on its face shows 20 users who are "external" or whose non-BitMEX employers are explicitly identified (e.g. "Bytecode.io"). Davidson Decl. Ex. A. The document also features a column headed "UserIsBot," meaning that the Slack user is a robot—ten of the users were robots. *Id*. The most cursory review by the government of this document would have revealed that it does not support their contention, and that is before accounting for the duplicate users, former employees, and other external individuals. As attached to the declaration of Ms. Davidson, the Slack list includes (i) outside counsel, (ii) duplicative accounts (such as username Jinming, attributed to Jinming Shao, and username JinmingShao, also attributed to Mr. Shao, and Tim Tickel having the usernames tim.tickel, twt, and twt_test), and (iii) deactivated users. *See id*. ¶ 6–7. In fact, the Company had 87 employees and contractors in February 2019. *See id*. ¶ 5.

Guideline § 8C2.5(b) uses the term "employee," rather than "personnel" or "headcount" or some other term broader than "employee." We have found no case construing that term within the context of this Guideline. The government argues that the Court should consider contractors as employees for the purposes of §8C2.5(b)(3). Gov't Sent'g Mem., 17. In doing so, it relies on *Anthony v. Nw. Mut. Life Ins. Co*., 130 F. Supp. 3d 644, 652 (N.D.N.Y. 2015), for the proposition that Sarbanes-Oxley whistleblower protections extend to contractors, suggesting the case interprets the term "employee" in the statute. *Id.* In fact, the statute at issue in that case, 18 U.S.C. § 1514A, expressly covers "any officer, employee, *contractor*, subcontractor, or agent of [a publicly traded] company or nationally recognized statistical rating organization." (Emphasis added). *Anthony* addresses how to treat employees of contractors to public companies (such as the employees of law firms and accounting firms) but does not address the question whether "employee" under that statute or any other encompasses "contractors." *Id.* The government has

cited no authority for the Court to interpret "employee" in the Guideline to cover contractors, and we ask the Court to apply the plain text of the Guideline.

If the Court includes non-employee contractors, the Company, its subsidiaries and affiliates reached a total of 200 only in May 2020, five months before the end of the charged period. *See* Davidson Decl. ¶ 5. So at most, the Company had more than 200 personnel for only five months of the sixty month period. The Third Circuit in *United States v. Electrodyne Sys. Corp.* directed the District Court to consider on remand "the number of days" the company had fifty or more employees for the purposes of determining the company's culpability score, 147 F.3d 250, 256 (3d Cir. 1998), and in *United States v. Hingorani*, the Court accepted defendants' argument that the lower number of employees should be considered for the purpose of determining the company's culpability score because "except for one quarter at the very end [of the relevant period], the number of employees was less than [the Guidelines limit]," Sent'g Tr. 42:15–44:10, No 4:13-cr-00049 (S.D. Iowa Mar. 12, 2015), ECF No. 166.

We ask the Court to follow the text of the Guideline and the evidence offered regarding number of employees, and adjust the Culpability score upward by two points under §8C2.5(b)(4) rather than three points under §8C2.5(b)(3). If the Court will include contactors in the calculus as proposed by the government, we ask the Court to follow the lead of the Third Circuit and the District of Iowa and endorse the lower adjustment because the Company had more than 200 personnel for only 1/12th of the charged period.

*(b) §8C2.5(g)(3) – Acceptance of Responsibility*

The Company's culpability score should further be reduced by one point for "clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct" pursuant to U.S.S.G. § 8C2.5(g)(3). The Company waived indictment and pleaded guilty on the

day that it was charged. Its allocution was fully sufficient to make out the elements of the offense. And it has acknowledged its guilt to the government for more than two years. The Guidelines recognize that pleading guilty, combined with truthful admission of involvement in the offense, is sufficient to receive the one point reduction for acceptance of responsibility unless outweighed by conduct of the organization that is "inconsistent with such acceptance of responsibility." *See* U.S.S.G. § 8C2.5 cmt. n.14 (U.S. Sent'g Comm'n 2023).

The government points to no such conduct. Rather, it argues that because the Company did not acknowledge its guilt until after the founders' pleas, its concession was of no moment because it "had no defense." Gov't Sent'g Mem., 18. But of course, every defendant has the right and ability to contest the government's proof against the reasonable doubt standard, and countless defendants in this courthouse have pleaded guilty and received acceptance of responsibility points, with the consent of the government, despite the government's subjective view that the defendant "had no defense." That the government wishes the Company admitted its guilt before its controlling shareholders did does not mean the Company did not "clearly demonstrate[] recognition and affirmative acceptance of responsibility for its criminal conduct." In this case, the Company accepted responsibility for its action more than two years ago, when the first of its founders pleaded guilty in February 2022, and has taken no action inconsistent with such acceptance of responsibility since that time—and indeed, the Company had fully remediated the conduct long before the founders' pleas. Indeed, though it seeks no cooperation credit under § 8C2.5(g)(2), the Company provided substantial cooperation to the government throughout its prosecution of the founders.

For these reasons, the Company's culpability score should be six.

## 5. NO ADDITIONAL DISGORGEMENT IS REQUIRED

The government asks the Court to add disgorgement to the fine range, pursuant to Guidelines §8C2.9, which provides that the Court should add to the fine "any gain to the organization from the offense that has not and will not be paid as restitution or by way of other remedial measures." Gov't Sent'g Mem., 18–19. This provision does not change the fine range applicable to HDR. The gain at issue is $30 million, as represented to the Court by the government. The founders paid that amount as fines. The Company has paid $80 million to the CFTC and FinCEN to remedy the same BSA violation. The government agreed that the individual defendants could use the same $10 million to pay the criminal fine and to settle with the CFTC. Hence there is no gain that has not been paid as restitution or by way of other remedial measures. In addition, the Company has invested over $20 million in building out its risk and compliance programs as remedial efforts. *See* HDR Sent'g Mem. 14.

Moreover, the Court has noted the disgorgement by the founders, Hayes Sent'g Tr. 55:1–3 (The Court: "There has been disgorgement of the alleged monetary gain through the payment of the penalty as a result of the CFTC case."); Delo Sent'g Tr. 26:18–19 (The Court: "There has been disgorgement as a result of the payment of the $10 million CFTC penalty."); Reed Sent'g Tr. 23:16–19 (The Court: "There has been disgorgement as a result of the defendant's payment of the $10 million penalty to the CFTC."), and disgorgement of their gain is disgorgement of the Company's gain.

In any event, with a gain of $30 million, a culpability score of six, and the offsets in the fine range recognized in Guidelines §8C3.4 and the offset for payments to the CFTC and FinCEN recognized by the government and the Court in this case, the applicable Guidelines range is -$74

million to -$38 million. There is room to account for any residual gain under §8C2.9 and still have a negative fine range. Section 8C2.9 does not change the outcome here.

## 6. JUSTICE IS DONE WITH A FINE OF NO MORE THAN $110 MILLION

The analysis above establishes that the appropriate Guidelines range for the Company's violation of the BSA is negative, in light of the gain from the offense, the proper calculation of the culpability score, and the offsets recognized in the Guidelines and by the government's and this Court's acknowledgement in this case that penalties paid to the CFTC should count against the fine. That is not because the offense is not serious, but because it has already been well and properly addressed by prosecution of the individuals and enforcement by the United States against HDR. *See Dean v. United States*, 581 U.S. 62, 67 (2017); *United States v. Alryashi*, 841 F. App'x 330, 331 (2d Cir. 2021) (stating that the parsimony clause of 18 U.S.C. § 3553(a) requires the imposition of a sentence that is sufficient, but not greater than necessary, to comply with the goals of sentencing). Beyond disagreeing with the component parts of that analysis, the government offers a series of reasons why it believes a penalty even larger than the $110 million that has already been assessed is warranted. None of those arguments is persuasive.

### *(a) Seriousness of the Offense*

As we acknowledged in our opening submission, the BSA violation is serious, having as it does the potential to undermine the integrity of the financial system. HDR Sent'g Mem., 19. But the Guidelines are calibrated to meet the seriousness of the BSA offense, and properly calculated as they have been above, the result is an appropriate overall penalty for the violation.

The government's disagreement, beyond sparring about the inputs to the Guidelines, is fundamentally the same disagreement that it expressed in connection with the founders' sentencings: The government believes the law should assess the BSA violation more seriously than

it does. To that end, the government stresses its concerns that the BitMEX platform was used for money laundering, and asks that HDR be sentenced accordingly. This argument has two fundamental flaws: HDR did not knowingly permit money laundering on the BitMEX platform, and as the Court noted in 2022, "the government chose not to accuse the defendant of money laundering." Hayes Sent'g Tr. 54:15–16. No money laundering charge has been brought against HDR. HDR did not plead guilty to money laundering, it did not commit money laundering, and its sentence should not be based in any way on concerns the government may have about money laundering by others.

To the same end, the government has included allegations about claimed false statements to a foreign bank in the Information. We have been clear in our opening submission: Those allegations are denied, they do not make out any crime within the jurisdiction of this Court, and they are irrelevant to the BSA offense for which HDR is to be sentenced. In its submission, the government's argument shifts from a claim that the alleged false statements were somehow in furtherance of the BSA violation, which simply makes no sense, to a concession that this is character evidence. Gov't Sent'g Mem., 21 ("The picture BitMEX is seeking to present to the Court is of a corporate 'good citizen' that merely committed a regulatory violation. Its deliberate lies to a financial institution are just one piece of evidence that such a picture is decidedly false."). We fail to see how the Company obtaining a bank account in another country into which it put its own money and paid expenses demonstrates such bad character (regardless how the account was obtained) that this Court should sentence HDR differently than the Guidelines suggest.

The government also continues to press its hyperbolic claims that the Company's controls to restrict U.S. users were a sham or "pretextual." *See id*. 4, 20. We described the Company's evolving controls and sophistication at length in our opening submission, as did the founders at

the time of their sentencings. *See* HDR Sent'g Mem. 5–7; Hayes Sent'g Mem. 12–16; Delo Sent'g Mem. 21–23; Reed Sent'g Mem. 7–8. The Company's controls were real—they evolved over time, imperfect at first but with significant improvements by 2018, and worked to successfully screen U.S. users from BitMEX. *See* Delo Sent'g Tr. 26:8–13 (the Court: "On the other hand, it is also true that the company implemented procedures over time to attempt to screen out United States customers and did screen out a considerable amount of business from United States customers."). The Company has admitted that it knew it had U.S. users and that its controls were insufficient to guarantee there were none; it denies that the controls were a sham.[13]

*(b) Need to Avoid Unwarranted Sentencing Disparities*

The government next relies on three prosecutions that it argues are "similar corporate resolutions in the Bank Secrecy Act and similar contexts" to support its claim that a penalty of over $400 million is appropriate. Gov't Sent'g Mem., 25. The cases are simply not similar. Only one involves a standalone BSA violation. In the U.S. Bancorp case, which involved a deferred prosecution agreement with the Department of Justice and other regulatory enforcement actions, the fifth largest bank in the U.S. processed over $700 million in suspicious transactions and identified 2,121 unfiled SARs during a SAR lookback analysis. Complaint ¶¶ 11, 65, *U.S. Dep't Treas. v. U.S. Bank Nat'l Ass'n*, No. 18 Civ. 1358 (S.D.N.Y. Feb. 15, 2018), ECF No. 1. The bank also allowed a $2 billion money laundering scheme to continue operating through accounts at U.S. Bank without timely filing a SAR, even after an internal investigation closed certain of the accounts. *See* Press Release, U.S. Att'y's Off., S.D.N.Y., *Manhattan U.S. Attorney Announces*

[13] The government continues to push its view that HDR launched KYC only in response to the U.S. government investigations in 2018. Gov't Sent'g Mem., 20. If that were true, the Company would have done KYC only to weed out U.S. persons. Instead, the Company decided in mid-2019 to launch a proper and thorough-going KYC program as part of a broader initiative to implement better systems and controls as the business matured. The controls were not a sham and the Company was trying, albeit imperfectly, to run a compliant business globally.

*Criminal Charges Against U.S. Bancorp For Violations Of The Bank Secrecy Act* (Feb. 15, 2018), https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-criminal-charges-against-us-bancorp-violations-bank. The bank agreed to pay a $528 million penalty. The cases are not comparable: The $700 million in suspicious transactions in U.S. Bancorp are nine times larger than the $80 million on the BitMEX platform as confirmed by the independent consultant that conducted a SAR lookback in connection with the FinCEN resolution. And HDR did not knowingly allow money laundering to occur in any size.

The second case was a deferred prosecution agreement with Commerzbank in which it was charged with a sanctions offense in addition to BSA failures that facilitated a massive fraud in which more than $1.6 billion passed through Commerzbank accounts over the course of a decade. *See* Press Release, U.S. Att'y's Off., S.D.N.Y., *Commerzbank AG Admits to Sanctions and Bank Secrecy Violations, Agrees to Forfeit $563 Million and Pay $79 Million Fine* (Mar. 12, 2015), https://www.justice.gov/opa/pr/commerzbank-ag-admits-sanctions-and-bank-secrecy-violations-agrees-forfeit-563-million-and. The agreement provided that Commerzbank pay a $79 million fine and $263 million in forfeiture for the sanctions offense, and an additional $300 million in forfeiture in connection with its BSA violations. The $300 million in forfeiture was "remitted to victims of a multi-billion dollar securities fraud scheme that was permitted to operate through Commerzbank." *Id*. The case was clearly about more than a stand-alone BSA violation, and is not instructive here.

The third case is the recent enforcement action against Binance, the world's largest cryptocurrency exchange, relating to conduct from 2018 through November 2023. On November 21, 2023, Binance pleaded guilty to conspiracy to conduct an unlicensed money transmitting business and failure to maintain an effective AML program, operating an unlicensed money

transmitting business, and willfully causing violations of U.S. sanctions laws. Plea Agreement at 2–3, *United States v. Binance Holdings Ltd.*, No. 2:23-Cr-00178 RAJ (W.D. Wash. Nov. 21, 2023), ECF No. 23. Binance was sentenced to a fine of over $1.8 billion and forfeiture of more than $2.5 billion, Order of Forfeiture and Judgement, *Binance*, No. 2:23-Cr-00178 RAJ (W.D. Wash. Feb. 23, 2024), ECF Nos. 31, 35, and its founder and owner, Changpeng Zhao, who pleaded guilty to willful failure to maintain an effective AML program in violation of the BSA, was sentenced to four months' imprisonment and a criminal fine of $50 million. Amended Judgment at 2–3, *United States v. Zhao*, No. 2:23-Cr-00179 RAJ (W.D. Wash. May 1, 2024), ECF No. 91. The government argues that the Binance prosecution, though it involved money-transmitter and sanctions offenses not present here, is instructive because the failure "to have an adequate AML policy was analogous to BitMEX's conduct in this case, and formed a substantial part of the conduct for which the fine was imposed." Gov't Sent'g Mem., 25–26. That is a remarkable position for the United States to take here. Binance admitted having "more than a million U.S. retail users," Information at 3, *Zhao*, No. 2:23-Cr-00179 RAJ (W.D. Wash. Nov. 14, 2023), ECF No. 1 while in the charged period BitMEX never had a million active users from anywhere, *see* Delo Sent'g Mem. Ex. I. And the same United States argued to the District Court in Washington that "the BSA violations Zhao committed at Binance were approximately 170 times more severe than those committed by Hayes at BitMEX" based on the comparison between the suspicious transactions for which a SAR was not filed on each platform. Gov't Sent'g Mem. for Zhao at 20, *Zhao*, No, 2:23-Cr-00179 RAJ (W.D. Wash. Apr. 23, 2024), ECF No. 78. The government continued, "[n]or did the BitMEX case present anywhere [near] the harm to national security caused by Binance's failure to implement and maintain adequate compliance controls, and the sanctions violations that resulted." *Id.*

HDR agrees with the United States: The BitMEX BSA violation was 1/170th as serious as the Binance BSA violation. And the $1.8 billion criminal fine against Binance was based on the money transmitter and sanctions offenses as well as the BSA violation. If the comparison to Binance suggests anything, it is that justice is done here with a fine of no more than the $110 million that has already been paid.[14]

*(c) Deterrence*

Finally, the government argues that the Court must impose a penalty beyond the significant penalties already imposed because (a) the prosecution of Hayes, Delo, and Reed did not stop all crypto-related crime, and (b) failure to fine HDR further would "telegraph to other similarly situated cryptocurrency exchanges that they can flagrantly violate the BSA by servicing U.S. customers without an adequate KYC/AML program, regardless of the resulting criminal and suspicious money flows they facilitate, reap financial gains from that behavior, and then retain a substantial portion of those gains even if they are apprehended." Gov't Sent'g Mem., 23, 24. The government's concept of general deterrence is flawed.

First, the government acknowledges that its indictment and conviction of HDR's founders "made plain to the industry that the AML and KYC violations long being committed by its participants were not only criminal but would be prosecuted." *Id*. at 22. But it argues that an even more substantial financial penalty against HDR for the same conduct is necessary years later because crime has not been solved in the crypto space: The fact that Binance committed its own BSA, sanctions, and money transmitter offenses after the Hayes, Delo, and Reed prosecution is simply not a reason to fine HDR more than the facts or the Guidelines support.

---

14 1/170th of $1.8 billion is $10.5 million, and the division should be done on a number smaller than $1.8 billion, as much of that fine was driven by the non-BSA offenses. So taking the United States at its word, the Company has already very significantly overpaid.

The fact that crime continues to exist is the wrong test to determine whether a general deterrent message has been sent. Examples abound of industry participants paying increased attention to compliance. Directly following the indictment of the HDR founders, Deribit, another cryptocurrency platform, announced it was implementing KYC, with industry news sources noting that "Deribit's plan comes soon after similar action by rival and troubled derivatives exchange BitMEX." Yogita Khatri, *Deribit to Mandate ID Verification For All Traders Before the End of the Year*, The Block (Oct. 21, 2020), https://www.theblock.co/post/81874/deribit-crypto-derivatives-verification-2020. Crypto exchange Bitstamp hired a new U.S. Chief Compliance Officer in 2021 with a strong AML background and noted that "[a] compliance first culture is critical in today's financial services businesses and none more so than in crypto exchanges." *Thomas Hook Joins Bitstamp as U.S. Chief Compliance Officer*, Bitstamp (June 9, 2021), https://blog.bitstamp.net/post/thomas-hook-joins-bitstamps-as-u-s-chief-compliance-officer/. Crypto exchange OKX similarly stressed the importance of compliance with the law, telling Axios "[i]f there is an enforcement action, it's going to cost more than what you're spending [on compliance]." Crystal Kim, *Crypto Firms Poised to Spend More on Compliance*, Axios (Jan. 9, 2023), https://www.axios.com/2023/01/09/crypto-spending-compliance. Reports have noted that OKX "moved its U.S. compliance team to top priority," likely resulting from the "increased regulatory scrutiny on cryptocurrency exchanges for anti-money laundering practices." Mohammad Shahidullah, *OKX Repositions US Compliance Team as Highest Priority*, Crypto.News (Mar. 28, 2024), https://crypto.news/okx-repositions-us-compliance-team-as-highest-priority/.

The government argued for a higher sentence for Hayes on a general deterrence basis, and the Court clearly stated:

> I often say with respect to general deterrence that any sentence must be just for the individual defendant. If we impose the sentence on the basis of general deterrence that wasn't just for the individual defendant, we would end up using the law to impose sentences on individuals that were not just for the individual defendants, and that would be contrary to our law.

Hayes Sent'g Tr. at 51:12–18. HDR should not be punished more severely than otherwise because the government believes Binance or other industry participants should not have committed their own crimes.

The Binance prosecution is also instructive on the government's second point, in which it contends that HDR must be fined more than it has already paid to the CFTC and FinCEN and more than its founders have paid to the United States, or else corporations will think that crime pays. Gov't Sent'g Mem., 24. That prosecution, which the government seems to propose as a model for this Court, involved the following:

- The Company and its CEO settled with the CFTC for $950 million;
- The Company settled with FinCEN and OFAC for $850 million;
- The Company was fined $1,805,475,575 for the BSA, money transmitter, and sanctions offenses, but
    - Was credited $1.8 billion for its payments to the CFTC, FinCEN, and OFAC, and
    - Paid only $5,475,575 in new money as a criminal fine; and
- Paid forfeiture of more than $2.5 billion.

Binance Plea Agreement, 13–14. Leaving aside forfeiture, which is not an available remedy for the BSA offense for which HDR is to be sentenced, the structure of the Binance sentence is virtually identical to that proposed here: Binance settled with three civil regulators, got full credit against the criminal fine for the funds paid in those settlements, and paid only $5.5 million (or 0.3% of the total criminal fine) in additional money. The government is right to look to Binance

as a model. Because HDR's conduct was so much less serious (as the government said, 1/170th) than that of Binance, there is no need for even the tiny percentage of "new money" meted out in that case. The message of this prosecution will not be blunted by the sentence dictated by the Guidelines as calculated above.

## 7. CONCLUSION

For the foregoing reasons, the Company respectfully requests that the Court impose a sentence of no fine beyond the $110 million already paid to the government by the Company and its founders.

Dated: New York, New York
September 25, 2024

Respectfully submitted,

David C. Esseks
Eugene Ingoglia
Melinda Bothe
Megan Sharkey
ALLEN OVERY SHEARMAN
STERLING US LLP
599 Lexington Avenue
New York, New York 10022
Tel: (212) 848-4000
*david.esseks@aoshearman.com*
*eugene.ingoglia@aoshearman.com*
*melinda.bothe@aoshearman.com*
*megan.sharkey@aoshearman.com*

*Attorneys for Defendant HDR Global Trading Ltd.*