A&O SHEARMAN

BY ECF & EMAIL

**Allen Overy Shearman Sterling US LLP**
599 Lexington Avenue
New York, NY 10022

Tel +1 212 848 4000
Fax +1 646 848 7179
Direct line +1 212 610 6326
david.esseks@aoshearman.com

The Honorable John G. Koeltl
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl St.
New York, New York 10007

October 3, 2024

Re: *United States v. HDR Global Trading Ltd.*, No. 24-cr-00424 (JGK)

Dear Judge Koeltl:

We respectfully submit this letter on behalf of our client, HDR Global Trading Limited ("HDR" or the "Company"), in the above-captioned matter. We write in response to a limited set of issues raised in the government's surreply dated October 1, 2024 (Dkt. 27, "Gov't Ltr.") in advance of HDR's sentencing scheduled for October 7, 2024.

1. The Government Articulated Its Position On Gain For The First Time In Its Sentencing Submission and The Company Responded At The First Opportunity

The government suggests that the Company should, in its initial sentencing submission, have anticipated positions not yet taken and evidence not yet offered by the government to the Court and suggests that the Company's arguments and evidence on that point are offered too late. The government bears the burden of proving gain, and until it has articulated those positions and offered evidence to the Court, the defendant can only speculate on the government's evidence. While the Probation Department had taken a position in the draft PSR, that Department is an arm of the Court and not of the prosecution and its positions on gain are no substitute for articulation and evidence from the party that bears the burden. The Company's submission was timely.

Allen Overy Shearman Sterling US LLP is a limited liability partnership organized under the laws of the State of Delaware. Allen Overy Shearman Sterling US LLP is affiliated with Allen Overy Shearman Sterling LLP, a limited liability partnership registered in England and Wales with registered number OC306763 and with its registered office at One Bishops Square, London E1 6AD. It is authorized and regulated by the Solicitors Regulation Authority of England and Wales (SRA number 401323). The term partner is used to refer to a member of Allen Overy Shearman Sterling LLP or an employee or consultant with equivalent standing and qualifications. A list of the members of Allen Overy Shearman Sterling LLP and of the non-members who are designated as partners is open to inspection at its registered office at One Bishops Square, London E1 6AD. Allen Overy Shearman Sterling US LLP is an affiliate of Allen Overy Shearman Sterling LLP. Allen Overy Shearman Sterling LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Austin, Bangkok, Beijing, Belfast, Boston, Bratislava, Brussels, Budapest, Casablanca, Dallas, Dubai, Dublin, Düsseldorf, Frankfurt, Hamburg, Hanoi, Ho Chi Minh City, Hong Kong, Houston, Istanbul, Jakarta (associated office), Johannesburg, London, Los Angeles, Luxembourg, Madrid, Milan, Munich, New York, Paris, Perth, Prague, Riyadh, Rome, San Francisco, São Paulo, Seoul, Shanghai, Silicon Valley, Singapore, Sydney, Tokyo, Toronto, Warsaw, Washington, D.C.

2. The Government Has Not Met Its Burden To Prove Gain

a. The Burden Does Not Shift

The government bears the burden of proof at sentencing. The government asserts that, once a reasonable approximation of gain has been established, the burden shifts to the defendant to refute the showing, and that a lack of contradictory evidence means the government's position was not refuted. (Gov't Ltr. at 2.) But in quoting *United States v. Germosen*, the government omitted the qualification that the "district court [is] entitled to rely on dollar amounts summarized by the prosecution *absent indication that amounts are incorrect*." 139 F.3d 120, 129 (2d Cir. 1998) (citing *United States v. Reese*, 33 F.3d 166, 174 (2d Cir.1994)) (emphasis added). The Company need not, as the government suggests, offer a competing set of numbers to refute its position; rather it need only provide some indication that the government's estimate is incorrect. The Company has done so by unpacking the flaws in the government's use of the User Data Spreadsheets, amply demonstrating that the government's estimate is incorrect. (HDR Reply Mem. at 6–16, Dkt. 22.) The government continues to bear the burden.

b. The Company Has Never Said That 9.51% Of Revenue Was From The U.S.

The government relies on a letter from Company counsel in September 2022 as a representation that "9.51% of the Company's users who traded on the platform were attributable to the United States." (Gov't Ltr. at 2.) The September 2022 letter in fact stated, in pertinent part, as follows:

> <u>Slide 19 (BMX-SDNY-PRES-00000226):</u> The data sources for the pie charts on Slide 19 are the "User Data Spreadsheets" produced to you on February 12, 2020 and described in that accompanying letter. The User Data Spreadsheets are three spreadsheets that each represent a different slice of the Company's user data—as reflected at the date of the user data snapshot, January 15, 2020—to identify apparent U.S. users. Specifically:
>
> - BMX-SDNY2-00008596 reflects all registered users with a "Country" field attributed to the U.S. on the User Table at the date of the snapshot. Of the 50,498 registered users identified by this spreadsheet, 759 had ever traded on BitMEX;
> - BMX-SDNY2-00008597 reflects all registered users with a "GeoIP Country" field attributed to the U.S. on the User Table at the date of the snapshot, excluding any users on BMX-SDNY2-00008596, discussed above. Of the 41,636 registered users identified by this spreadsheet, 24,973 had ever traded on BitMEX; and
> - BMX-SDNY2-00008598 reflects all registered users who ever had an account login attributed to the U.S. on the User Events Table any time after August 2018, excluding any users on BMX-SDNY2-00008596 and BMX-SDNY2-00008597, discussed above. Of the 27,006 registered users identified by this spreadsheet, 22,761 had ever traded on BitMEX.

- Adding these figures together, the Company had 119,140 registered users *with some attribution to the U.S.,* and 48,493 of those users had ever traded on BitMEX. In January 2020 (when the User Data Spreadsheets were generated), the Company had 1,370,842 total registered users, and 509,853 registered users who had traded on BitMEX.

- Accordingly, **8.69%** of the Company's registered users are attributable to the U.S. and **9.51%** of the Company's registered users who had ever traded on BitMEX are attributable to the U.S. *according to the User Data Spreadsheets*.

(Letter from Allen & Overy to AUSAs Greenwood, Raymond, and Rehn, September 16, 2022 (emphasis added) (footnotes omitted)).

The September 2022 letter followed a presentation made to the U.S. Attorney's Office earlier that year at which the Company argued, among other things, that the BSA violation did not drive the success of the BitMEX business and hence the government should not prosecute the entity for the admitted violation. The letter, and the presentation, focused on the various available slices of data that gave any insight into the size of the U.S. user population, including the User Data Spreadsheets previously produced to the CFTC in January 2020 and reproduced to the government in February 2020. The September 2022 letter reiterated the descriptions of those three spreadsheets previously given to the CFTC, as set forth above. Nothing in the September 2022 letter changed the nature of the data in those spreadsheets, and nothing in that letter could change the analysis we set out in our reply submission, namely, that those spreadsheets "do not establish how many BitMEX users traded from the United States over time;" rather they:

> establish only that as many as 9.51% of all users who ever traded on BitMEX as of the date of that data snapshot had at least one U.S. touchpoint ever, namely a self-identification as located in the U.S. (a tiny portion) or at least a single GeoIP connection to the U.S. (most of the data set). That does not support an extrapolation that 9.51% of the revenue of the Company over the six-year period of the charged offense was from U.S. users.

(HDR Reply Mem. at 11–12).

The September 2022 letter also detailed a variety of other slices of data, all of which described much smaller percentages of potential U.S. users or U.S. user revenue than the 9.51% contained in the 2020 User Data Spreadsheets:

> <u>Slide 17 (BMX-SDNY-PRES-00000224):</u> The data source for the pie charts on Slide 17 is the country revenue report generated in August 2019 and marked as BMX-SDNY3-00020832. Each pie chart reflects the revenue attributed to the jurisdictions identified in the chart's legend, and for the particular month identified in the title, as provided by the "Revenue (USD)" column (Column J) of the report and sorted by "Country Name" (Column A). Using the total revenue received for each month (*i.e.* the sum of Column J), we identify the percentage of revenue attributed to the U.S. for each pie chart on this slide:

- In January 2018, **0.61%** of the Company's total revenue received that month is attributed to the U.S. (The total revenue received was $23,767,599 and $144,540 of this revenue is attributed to the U.S.);

- In April 2018, **1.34%** of the Company's total revenue received that month is attributed to the U.S. (The total revenue received was $44,374,131 and $594,713 of this revenue is attributed to the U.S.);

- In July 2018, **0.98%** of the Company's total revenue received that month is attributed to the U.S. (The total revenue received was $49,356,275 and $484,958 of this revenue is attributed to the U.S.);

- In October 2018, **0.07%** of the Company's total revenue received that month is attributed to the U.S. (The total revenue received was $26,065,802 and $17,508 of this revenue is attributed to the U.S.);

- In January 2019, **0.02%** of the Company's total revenue received that month is attributed to the U.S. (The total revenue received was $20,769,548 and $5,094 of this revenue is attributed to the U.S.);

- In April 2019, **0.14%** of the Company's total revenue received that month is attributed to the U.S. (The total revenue received was $40,281,273 and -$56,032 of this revenue is attributed to the U.S. [The revenue attributed to the U.S. for this month is negative because the company paid more "maker" fees to this population of accounts than it received from "taker" fees, but the absolute value of this revenue was used to calculate the percentage.]); and

- In July 2019, **0.14%** of the Company's total revenue received that month is attributed to the U.S. (The total revenue received was $77,565,551 and -$107,469 of this revenue is attributed to the U.S. [The revenue attributed to the U.S. for this month is negative because the company paid more "maker" fees to this population of accounts than it received from "taker" fees, but the absolute value of this revenue was used to calculate the percentage.]).

- Slide 18 (BMX-SDNY-PRES-00000225): The data source for the pie charts on Slide 18 is the Company's User Table as it appears in the Static Database, made available to you in October 2021. As described in our October 20, 2021 letter, the Static Database contains the User Table as it appeared on August 12, 2021 (the date the Company took the User Table snapshot to create the database). Using the total number of registered users in this User Table snapshot, we identify below the percentage of users attributed to the U.S. for each pie chart:

  - Using the "Country" field in the User Table snapshot, **2.95%** of the registered users are attributed to the U.S. (The total number of registered users at the time of the snapshot was 2,083,030 and 61,472 of those users are attributed to the U.S. according to their "Country" field);

- Using the "GeoIP Country" field in the User Table snapshot, **4.72%** of the registered users are attributed to the U.S. (The total number of registered users at the time of the snapshot was 2,083,030 and 98,373 of those users are attributed to the U.S. according to their "GeoIP Country" field).

(Letter from Allen & Overy to AUSAs Greenwood, Raymond, and Rehn, September 16, 2022 (footnotes omitted)).

The government has cherry-picked the slice of Company data that it likes best, and neglected to show the Court the other data that reflects smaller U.S. user numbers. Nor has the government addressed the significance of that other data provided to it by the Company years ago.

c. High-Volume Non-U.S. Traders Do Not Generate U.S. Revenue

In support of its claim that the 9.51% of users figure is understated, the government continues to argue that certain high volume trading firms were U.S. users behind their offshore entities. (*See* Gov't Ltr. at 3–4.) The entities that the government has referenced all had offshore affiliates that provided formation documents for the offshore entity and a written attestation that they would not trade from the U.S. Even in the documents attached by the government, the founders noted that future logins from the U.S. would not be tolerated. (*See* Gov't Ltr. Ex. B ("I will reset [a corporate account] for now" "But next time they log in…")). In addition, certain offshore entities had back office and compliance functions in the U.S., and therefore would likely have logged into their BitMEX accounts from the U.S. for non-trading purposes. (*See* HDR Reply Mem. at 13–14.) The attestations that certain of the offshore entities signed expressly considers this possibility. (*Id*. at 14.)

The government then described these entities as "market makers" (while suggesting that the Company did as well) and claims this suggests a higher gain from the offense. (Gov't Ltr. at 4.) The Company did not describe any of these entities as market makers in its submissions. Instead, the Company explained that many of these entities provided liquidity to the platform and received the maker rebate that occurs in connection with each trade on BitMEX—each trade has a "taker" who takes liquidity from the platform and a "maker" who provides liquidity to the platform.[1] High-volume traders will typically be providing liquidity and receive a rebate rather than pay one to BitMEX.

Most fundamentally, however, non-U.S. users, however high their volume, cannot increase the gain from the offense in the U.S.

d. The 2020 User Data Spreadsheets Contain Many False Positives

The government claims that the Company identified "an error rate of approximately 1 in 5,000" by providing only ten examples of non-U.S. users that appear on the 2020 User Data

---

1 *See* "What are the Trading Fees and where can I see what I've paid?" BitMEX (June 2024) https://support.bitmex.com/hc/en-gb/articles/5903013223837-What-are-the-Trading-Fees-and-where-can-I-see-what-I-ve-paid (explaining that the "Maker rebate is a fee you receive when you place passive orders that provide liquidity," while the Taker fee is "[i]ncurred when your order takes liquidity from the orderbook.").

Spreadsheets. (Gov't Ltr. at 3.) But as the government knows, these examples were not an exhaustive accounting of all non-U.S. users who appear on the 2020 User Data Spreadsheets, but instead were offered as indicative examples of the flaws in the data on which the government is attempting to rely. For example, Chinese users accessing the platform using a U.S. VPN was both a known issue for the Company and not a surprise in light of the Chinese government's publicly reported restrictions on access to foreign websites. (*See* HDR Reply Mem. at 11 n.9, 13.)

e. The Analytics Report Shows 2.6% U.S. Users

While the government claims that the Company has "misrepresented its own report," in discussing the Analytics Report Q1 '17 (Esseks Decl. Ex. A, Dkt. 23) (Gov't Ltr. at 4), suggesting that the Company is wrongly comparing daily numbers versus monthly numbers, the report is clear: the average number of active users in the month of May 2017 was 277, and the total active users in May 2017 was 10,442. The result is U.S. users for May 2017 were 2.6% of the total. There is no need to resort to the government's ungrounded assumptions to discern the percentage of U.S. users reflected by the report.

3. Conclusion

The government has not met its burden to prove gain from the offense. The Company is ready for sentencing on Monday, October 7, 2024 as scheduled.

Respectfully submitted,

*/s/ David Esseks*

David Esseks

Copy: Jessica Greenwood, Assistant U.S. Attorney SDNY (*via ECF & email*)
Nathan Rehn, Assistant U.S. Attorney SDNY (*via ECF & email*)