```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

UNITED STATES OF AMERICA             :

       -v.-                          :        24 Cr. 424 (JGK)

HDR GLOBAL TRADING LIMITED,          :
    a/k/a/ "BitMEX,"
                                     :
              Defendant.
                                     :
---------------------------------------------------------------x
```

# THE GOVERNMENT'S RESPONSE TO BITMEX'S POST-*FATICO* HEARING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Jessica Greenwood
Thane Rehn
Assistant United States Attorneys
Southern District of New York
    *- Of Counsel -*

**TABLE OF CONTENTS**

DISCUSSION ................................................................................................................................. 1

    A.  It is Reasonable to Draw the Inference that Deposits into Trading Accounts Correlate to Trading Revenue .................................................................................................... 1

    B.  BitMEX Has Conceded That At Least 4.4% of Customer Deposits Were From U.S. Users ............................................................................................................................ 3

    C.  The Evidence Demonstrates that the Nine Crypto Trading Firms That Generated Almost All of the Disputed Deposits Were U.S. Entities ............................................ 4

CONCLUSION ............................................................................................................................ 15

The Government respectfully submits this memorandum in response to the submission made by HDR Global Trading Limited, a/k/a "BitMEX" (the "Company" or "BitMEX"), which was filed on December 10, 2024. (Dkt. 45 ("Def. Post-*Fatico* Mem.")). The Government has reasonably and conservatively estimated that 11.49% of all deposits to BitMEX customer accounts were made by U.S. users who traded on BitMEX. The Company's submission concedes a number of facts that support the Government's estimate of the gain to the Company from the offense. In particular, the Company has conceded that the Government is correct with respect to 4.4% of deposits that even BitMEX acknowledges are "attributable to U.S. users." (DX 7 at 17). In its post-*Fatico* submission, the Company attempts to challenge the remaining deposits identified by the Government, focusing primarily on the United States crypto trading firms that made up a large portion of those deposits. The Company's arguments, however, fail to rebut the evidence that those deposits, too, are attributable to U.S. customers. The record, taken as a whole, supports a finding that 11.49% of all deposits were made by U.S. users who traded on BitMEX.

## DISCUSSION

### A. It is Reasonable to Draw the Inference that Deposits into Trading Accounts Correlate to Trading Revenue

The Company's submission argues that deposits do not map to BitMEX revenue because BitMEX generated revenue from trading rather than deposits. BitMEX speculates that "it is not unfeasible that many accountholders deposited bitcoin to BitMEX for safe keeping rather than trading." (Def. Post-*Fatico* Mem. at 3 n.1). But the Government's estimate of U.S. deposits only includes deposits to accounts *that were in fact used for trading*. As the Government explained in its prior submission, the Government has agreed to remove U.S. deposits to non-trading accounts from the U.S. deposit volume. Thus, the Company's argument that "many accountholders" made deposits and did not trade is actually an argument that the true percentage of trading revenues

attributable to U.S. users is substantially higher than the percentage calculated by the Government. To properly calculate the percentage of deposits that were used for trading, any deposits to accounts that were not used for trading should be removed from the U.S. total of BitMEX deposits (which the Government did, as noted above) as well as from the overall total of BitMEX deposits globally. The Company, however, has failed to produce data that would allow the Government to remove deposits to non-trading accounts from the overall total of BitMEX deposits, meaning that the Government's percentage of U.S. deposits is necessarily lower than it should be.

Moreover, BitMEX knows the identity of all the U.S. accounts that the Government has identified to calculate its total. BitMEX could have, but has chosen not to, calculated the revenue attributable to those accounts based on the data that is uniquely in its possession. That is a telling omission, and further supports the inference that the Government's methodology of using the deposits from these accounts to estimate revenue is reasonable. *See, e.g.*, *United States v. Germosen*, 139 F.3d 120, 129 (2d Cir. 1998) (affirming district court's Guidelines calculation where the defendant "did not produce any evidence contradicting" the reasonable estimates of loss amount offered by Government witnesses).

The only other argument made by BitMEX on this issue is that it is theoretically possible that some U.S. persons might have transferred funds to BitMEX to be traded by non-U.S. persons. As discussed in the Government's prior submission, the evidence demonstrates that such transactions would be unlikely. (Dkt. 46 at 13-14). The Coinbase and Gemini subpoena returns contain hundreds of thousands of transactions, and the Company's data confirms that all the U.S. transactions on which the Government relies did in fact go into BitMEX trading accounts. Yet, BitMEX has not identified a single instance in which it claims that one person was sending money to another person to trade on BitMEX. Instead, the Company focuses on a subset of the Coinbase

2

and Gemini deposits in which the owner of the BitMEX account was later KYC'd—after the Relevant Time Period—as being a non-U.S. person. The Company asks the Court to rely on its after-the-fact non-compliant procedures instead of the contemporaneous KYC procedures used by registered United States cryptocurrency exchanges. As the Government explained in its prior submission, that argument is meritless. Even if BitMEX's non-compliant "KYC" processes were reliable (and they are not), those processes were all completed after the Relevant Period. The Coinbase and Gemini KYC data, which the Company does not dispute is reliable, show where these U.S. persons resided when the deposits in question were made, which is the relevant time period for purposes of this analysis.

### B. BitMEX Has Conceded That At Least 4.4% of Customer Deposits Were From U.S. Users

In its post-*Fatico* submission, the Company accepts that 4.4% of deposits were from U.S. users. Although the Company's submission does not actually do the math to arrive at this number, it acknowledges that the "subpoena returns from Coinbase and Gemini demonstrate transfers to BitMEX wallets from wallets belonging to U.S.-KYC'd accounts." (Def. Post-*Fatico* Mem. at 4). It also acknowledges that certain crypto trading entities identified by the Government as U.S. entities are in fact attributable to the United States, of which Profluent, which deposited nearly $75 million worth of Bitcoin, is the most significant. (Def. Post-*Fatico* Mem. at 37). These are the same categories that were conceded by the Company's witness at the *Fatico* hearing, and it was these deposits that led the Company's witness to conclude that 4.4% of deposits to BitMEX were from U.S. users. (DX 7 at 16-17). Taking this as a percentage of overall BitMEX revenue attributable to U.S. users, the Company's own numbers indicate the gain from the offense was at least 4.4% of $1.355 billion, or approximately $60 million.

### C. The Evidence Demonstrates that the Nine Crypto Trading Firms That Generated Almost All of the Disputed Deposits Were U.S. Entities

As explained in the Government's prior submission, the Government has identified $922 million in crypto deposits from known United States crypto trading firms, and the Company does not dispute that five of these entities and $75 million of these deposits are attributable to the United States. (*See* DX 7 at 14). Thus, the dispute between the parties relates to approximately $847 million worth of deposits. Although there are some additional trading firms that made nominal amounts of deposits, essentially this entire disputed number ($846 million) comes from just nine U.S.-based firms: Akuna Capital, Alameda Research, Circle, CMT, Cumberland DRW, Genesis, Galaxy Digital, Jane Street, and Jump Trading. Accordingly, the Government focuses on these nine entities below.

The Company spends the bulk of its post-*Fatico* submission attempting to dispute that these nine crypto trading firms were operating within the United States when they were trading on their BitMEX accounts. (Def. Post-*Fatico* Mem. at 8-40). However, almost all of its arguments rest on its own non-compliant procedures for onboarding these entities, which consisted of deliberately advising these trading entities to use offshore shell entities to onboard their BitMEX accounts. Indeed, for most of these crypto trading entities, the *only* evidence cited by the Company consists of these corporate onboarding documents that it used to allow these entities to trade on its platform. For a few of the entities, BitMEX includes one or two additional exhibits but still relies primarily on its onboarding documents.

The Court should not credit those BitMEX onboarding documents. The Company has offered no reason to question its executives' statements during the period of the offense conduct that they knew BitMEX was allowing "US traders" to trade through these "offshore non-US corporations." (GX 6). And as the Company's witness acknowledged at the *Fatico* hearing, the

4

BitMEX account onboarding documents simply do not provide evidence about where these trading firms conducted their operations, where they were actually headquartered, or where they were actually trading. (*Fatico* Tr. 122:4-17). Moreover, the Court does have a reliable source of evidence regarding the U.S. status of these entities. Almost all of them were KYC'd as a U.S. entity by Coinbase, Gemini, or both. And, as discussed below, there is additional documentary evidence of the U.S. status of each of these trading firms. Based on the evidence taken as a whole, each of these entities should be attributed to the United States.

**Akuna**

BitMEX has not submitted any documentation suggesting that Akuna Capital actually conducted any operations outside the United States, but relies solely on its onboarding documents for Akuna. If BitMEX had conducted a legally compliant KYC process for Akuna, however, it would have attributed Akuna to the United States. Akuna was KYC'd by Coinbase as a U.S. entity, using the same email address that it used to open its BitMEX account, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. In addition, Gemini KYC'd Akuna as a U.S. entity.

Coinbase KYC (GX 9):



Gemini KYC (GX 15):



In addition to the fact that Akuna was KYC'd as a U.S. entity by two other crypto exchanges, BitMEX executives were well aware that it was operating within the United States. GX 36 (Greg Dwyer meeting with Akuna's COO/CFO in Akuna's Chicago office in 2017). Indeed, the person who signed the "attestation" for the offshore entity on which BitMEX relies (DX 15), is the very same Chicago-based COO/CFO who met with Dwyer in Chicago in 2017, illustrating that these attestations bore little relationship to the facts of where these trading firms

5

were operating. Additionally, in anticipation of a separate visit to Chicago in 2018, Dwyer told Hayes that he was meeting with some BitMEX "clients" in Chicago, including "Akuna Capital." (GX 76 at 4).

### Alameda Research

The Company's discussion of Alameda in its post-*Fatico* submission is marred by several basic errors. The Company begins by asserting that Alameda "set[] up its corporate account in December 2018," and that when it did so "BitMEX employees made clear" that trading could not "occur from the U.S." (Def. Post-Fatico Mem. at 8). Both of those propositions are directly contrary to BitMEX's own records. The Company's records show that the Alameda account was set up on April 11, 2018, and that it conducted trading from within the United States from that date onward. In particular, BitMEX previously submitted an excerpt of its user table showing a list of accounts that logged in from the United States. (*See* Declaration of Julian Tehan, Dkt. 25, Ex. C). The relevant section of that BitMEX document is copied below, showing the date Alameda's original BitMEX account—account number 427289—was created.

| id | email | country | geoipcountry | geoipregion | geoipsubreg | firstname | lastname | username | emailverified | created | lastupdated |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 7310 | 427289 garywangtrading@gmail.com | VG | | IE | L | Alameda Research | Ltd. | Alameda Research | TRUE | 2018-04-11 | 2019-12-24 |

The Company's documents further show that it flagged Alameda as a U.S. entity and asked for onboarding documents on May 2, 2018, just a few weeks after the account was created. (GX 39 at 45). However, the exhibits on which the Company relies show that Alameda simply ignored that request for more than seven months, until December 2018, and that the Company took no efforts to curtail Alameda's trading throughout that time period. (Def. Post-*Fatico* Mem. at 10 (showing Sam Bankman-Fried first submitted onboarding documents on December 14, 2018)). Moreover, the Company's *Fatico* witness separately tabulated the volume of deposits that were made to the Alameda account created in April 2018, account number 427289, identifying a total

6

of more than $115 million in deposits to that account. (*See* DX 7 at 11, line 3 ($5.76 million in deposits to that account); *id.* at 13, line 12 ($109.45 million in additional deposits to that account)). And the Company's exhibits further show that when Bankman-Fried submitted the onboarding documents for Alameda, BitMEX created a new account number for the Alameda account and marked this new account as "KYC'd" to the British Virgin Islands, while never identifying the original Alameda account as having been KYC'd.[1] (DX 7 at 11, lines 1 and 3). Together, this evidence shows that from April 11, 2018 until December 14, 2018, Alameda traded on BitMEX from the United States using its original account, that BitMEX knew Alameda was a U.S. entity throughout that time period and received no corporate onboarding documents for that account whatsoever, and that Alameda deposited more than $115 million worth of Bitcoin into that account. At a minimum, those deposits are unquestionably attributable to Alameda's trading and business activity in the United States.

BitMEX claims that Alameda's deposits after December 14, 2018, should not be attributed to the United States. But even for that time period, BitMEX has failed to rebut the evidence that Alameda was operating in the United States. Most importantly, at the same time that Bankman-Fried created the new account in the name of the British Virgin Islands entity, he spoke with a BitMEX employee and asked her to allow Alameda to continue to log in from the United States. (GX 5). In its post-*Fatico* submission BitMEX simply ignores this evidence, taken from its own internal documents. On top of that, both Coinbase and Gemini continued to KYC Alameda as a U.S. trading entity throughout the Relevant Period, using much more reliable procedures than the

---

[1] The Alameda BVI entity did not even exist until several months after Alameda created its initial BitMEX account, further undermining BitMEX's suggestion that all Alameda trading should be attributed to that BVI entity. (GX 39 at 22).

sham BitMEX corporate onboarding procedures. The KYC information for Alameda from these exchanges, as of 2020, is below:

Coinbase KYC (GX 9):

| 7902 | 5a1f8ae3036e9300ee4670d5 | Alameda Research | LLC | alamedaresearch@gmail.com | 5 | 3 | 1992 | 2002 ADDISON STREET | BERKELEY | CA | 94704 |

Gemini KYC (GX 15):

| 16 | 711292 | 712946 | Alameda Research, Inc. | Yes | sam@alameda-research.com | )142 (EIN, CountryCod | 2002 Addison St | 302 | Berkeley | CA | 94704 |

Finally, BitMEX also cites exhibits regarding certain Hong Kong traders that Alameda submitted to BitMEX in October 2020 and August 2021 (DX 20, 21, 22, 23), but those documents were submitted after the Relevant Period and thus do not bear on Alameda's trading during the Relevant Period. The Government submits that the best evidence that Alameda continued to operate and trade on BitMEX from the United States in 2019 and 2020 are the Coinbase and Gemini KYC records for Alameda from that time frame and the BitMEX document indicating that BitMEX permitted Alameda to continue to log in from the United States during that time frame.[2]

**Circle**

As with Alameda, Circle submitted documents to nominally place its BitMEX account in the name of an offshore entity (GX 77), but the actual certificate attached to those documents that authorized trading for the account was executed in Boston and candidly stated that the trading was being conducted by a Boston entity (GX 84).[3] The email address for Circle's account on BitMEX,

---

[2] In its post-*Fatico* submission, the Company cites for the first time a portion of Bankman-Fried's testimony from his criminal trial, in which he testified that he moved from California to Hong Kong around the end of 2018, and that Alameda "started transitioning to Hong Kong" at some point after he moved there. (Def. Post-*Fatico* Mem. at 8). That testimony does not suggest, however, that Alameda ceased all of its United States operations or trading at that time. On the contrary, the continued KYC'd status of Alameda as a U.S. entity on other cryptocurrency exchanges into 2020 indicates that Alameda continued to operate in substantial part in the United States, and is best classified as a U.S. entity for the whole time period.

[3] This document directly undermines BitMEX's claims about Circle's trading being attributable to an offshore entity, so the Company's post-*Fatico* submission tries to characterize GX 84 as being "not specific to BitMEX." (Def. Post-*Fatico* Mem. 22). That characterization is simply wrong. The document is a certificate that was attached to Circle's email to BitMEX setting up its account, and it was executed on July 24, 2017, the same day the email was sent. (DX 77, DX 84). Moreover, the email was sent from a Circle trader who worked in Circle's Boston office, and described the certificate as being submitted to show that the email address was "allowed to trade on BitMEX." (DX 77).

▬▬▬▬▬▬▬▬ (GX 84; DX 7 at 13, line 8), was the same email address it used for its Coinbase account and its Gemini account, both of which were properly KYC'd to the United States. Coinbase KYC (GX 9):



Gemini KYC (GX 15):

In its post-*Fatico* submission, BitMEX relies on the corporate onboarding documents that are flawed for the same reasons described above. In addition, it cites a single email in which a Circle trader stated that he was primarily based in Hong Kong and had logged in from the United States "accidentally." (DX 105). But that single email (in which BitMEX authorized that trader to continue trading using a VPN anyway), does not outweigh the Government's exhibits showing that Circle's primary hub of trading on BitMEX was in the United States and BitMEX executives were aware of that. Arthur Hayes and Greg Dwyer corresponded with Circle's head of "Trading Operations," whose email signature line identified him as having a Boston address (GX 89), and Hayes and Dwyer participated in an ongoing "BitMEX <> Circle" chat, in which they and other BitMEX employees discussed Circle's trading activity on BitMEX with U.S.-based Circle traders, and also discussed the possibility of meeting with those Circle traders in New York and Boston. (GX 90 at 7-9). In addition, when submitting documents to financial institutions in connection with its over-the-counter business, BitMEX identified Circle as a United States entity, in direct contradiction to the onboarding documents it used to permit Circle to trade on BitMEX using an offshore entity. (GX 75, 87). Circle's U.S.-based "Director of Treasury and Trading Operations" also sent BitMEX an audit letter in which he identified the balance of Circle's BitMEX account as being held by the United States entity, not the offshore entity. (GX 86). In summary, there is

9

ample documentary evidence showing that Circle's trading was conducted in the United States by the United States entity.

### CMT

CMT is another entity for which the only evidence submitted by BitMEX is its corporate onboarding documents. Meanwhile, as with the other entities, CMT was KYC'd by Coinbase as a U.S. entity, using the same email address it used for its BitMEX account:

Coinbase KYC (GX 9):



The U.S. person identified on CMT's Coinbase account is also the same person who signed the "attestation" for BitMEX that it was not a U.S. entity. (*See* DX 36). CMT was also one of the "clients" in Chicago that Dwyer visited. (GX 76; *see also* GX 40 (Dwyer forwarding email from CMT to Arthur Hayes, listing CMT's Chicago address, and describing CMT as a "large trader" on BitMEX)).

### Cumberland DRW

Cumberland DRW does not appear in the Coinbase or Gemini subpoena returns, but the documentary evidence shows that Cumberland was a U.S. entity. Cumberland DRW was recently the subject of a SEC action in which it was identified as a Chicago-based entity. (GX 93). Moreover, Arthur Hayes described Cumberland as a U.S. entity in a 2014 email in which he identified its trading operations as being located in New York, Chicago, and London (GX 1), and BitMEX employees met with Cumberland employees in Chicago in July 2018 to discuss Cumberland's trading on BitMEX. (GX 3 at 5; GX 4). In preparing for that meeting, Greg Dwyer described Cumberland DRW as a one of BitMEX's "clients" in Chicago in a message to Arthur Hayes. (GX 76 at 4). In evaluating whether a particular entity was a United States customer of

BitMEX, this evidence of the location of the actual customer relationship between BitMEX and the customer is the most probative.

In opposing this conclusion, BitMEX relies primarily on handwritten notes taken by the CFTC of a call in which Cumberland's counsel described Cumberland's operations on BitMEX, including by identifying some traders located outside the United States. (Def. Post-*Fatico* Mem. at 12-13 (citing DX 95-99)). Those notes should be given little if any weight, as they involve at least three layers of unsworn hearsay. Moreover, those notes reflect an early stage of the CFTC investigation, during which Cumberland's counsel had an incentive to minimize the extent of Cumberland's U.S. operations when describing its BitMEX account. And even setting aside those reasons to view the notes skeptically, the notes actually tend to show that Cumberland's trading operations were both directed and supported from within the United States. Cumberland's counsel acknowledged that the "boss" of the trading operation was "based in Chicago," that the boss had "wallet access," and that the "wallet managers" were also based in Chicago. (DX 96). He also confirmed that the Cayman Islands entity, Cumberland Global Limited, was a shell company that "has no employees." (DX 97). All trading "reconciliation of Cumberland Global and DRW" for the BitMEX account is "done by staff in Chicago," and there are "many people in Chicago who have access to trade logs." (DX 97). This description is consistent with BitMEX documents showing that BitMEX provided regular support to Cumberland employees in Chicago to facilitate Cumberland's trading operations on BitMEX. (GX 3). To the extent these sparse notes tell us anything, then, they provide further evidence that Cumberland's trading on BitMEX was, at a minimum, supervised, managed, monitored, and facilitated from Cumberland's Chicago headquarters. Thus, far from supporting BitMEX's position, these notes further demonstrate that

in its relationship with Cumberland, BitMEX was "conduct[ing] business anywhere in the United States … in connection with" the trading of futures. 7 U.S.C. § 6(a).[4]

**Genesis**

BitMEX admits that it has no corporate onboarding documentation for Genesis Trading, the entity that was the source of the deposits identified in GX 23, and so has no basis for denying that Genesis was a United States entity. (*See* Def. Post-*Fatico* Mem. at 18). It also acknowledges that Arthur Hayes met with Genesis in New York to promote having Genesis trade on BitMEX, as evidenced by GX 1. The Company points out that there were offshore entities in the Genesis corporate family, citing the bankruptcy filing for one of those entities. (Def. Post-*Fatico* Mem. at 18). But the existence of those offshore entities is irrelevant. The relevant entity for these purposes is Genesis Trading, which the bankruptcy documents identify as a United States entity. *See In re Genesis Global Holdco, LLC, et al.*, No. 23-10063 (Bankr. S.D. N.Y. Jan. 23, 2023), First Day Hearing Presentation at 4 (available at https://restructuring.ra.kroll.com/genesis/ ) (identifying Genesis Trading as U.S. entity). Thus, there is no real dispute that these Genesis deposits should be included in the total of U.S. deposits.

**Galaxy Digital**

Galaxy Digital is another entity for which the only evidence submitted by BitMEX is its corporate onboarding documents. Meanwhile, as with most of the other entities at issue, Galaxy

---

[4] BitMEX's post-*Fatico* submission makes several reference to U.S. entities as having only conducted "back-office" operations in the United States in connection with their trading, and suggests that such "back-office" operations do not implicate U.S. regulations. (*E.g.*, Bitmex Post-*Fatico* Mem. at 32). That suggestion is meritless. To begin with, it is unclear what the Company means by "back-office" operations, aside from using the term in an attempt to downplay the extensive documentary evidence that its customers were in fact United State entities. In addition, BitMEX offers no legal authority for the suggestion that some of these customers' United States operations should be disregarded. That suggestion is contrary to the broad language of the statute, which subjects any "business anywhere in the United States … in connection with" futures trading to U.S. regulations. 7 U.S.C. § 6. Thus, to the extent the Company is attempting to suggest that its customers' "back-office" operations should not be considered in evaluating their status as U.S. entities, that is incorrect.

12

Digital was KYC'd by Coinbase as a U.S. entity, using the same email address it used for its BitMEX account:

Coinbase KYC (GX 9):

| 4776 | 5a21d575 | Galaxy Digital Trading, | LLC | | 27 | 2 | 1975 | | NEW YORK | NY | 10003 |

As discussed above, the Coinbase KYC information is sufficient evidence to show that Galaxy was a United States entity, but the evidence also shows that BitMEX founder Samuel Reed personally approved Galaxy Digital's trading using a New York IP address, directing BitMEX employees to "unblock this IP" after receiving a request from Galaxy that identified Galaxy's New York address. (GX 2).

### Jane Street

Jane Street is another entity for which the only evidence submitted by BitMEX is its corporate onboarding documents. Meanwhile, as with the other entities, Jane Street was KYC'd by Coinbase as a U.S. entity:

Coinbase KYC (GX 9):

| 9998 | 5a201f38a | Jane Street Global Trading, | LLC | | 10 | 5 | 1978 | | NEW YORK | NY | 10281 |

In addition to this, BitMEX employees specifically advised Jane Street to use an offshore entity to set up its BitMEX account while continuing to trade from within the United States. In February 2018 a Jane Street trader based in New York reached out to BitMEX about setting up an account. (GX 53). A BitMEX employee advised her: "If you create an account from the U.S.A. or have plans to access the account from the U.S.A. then opening a corporate account using your UK incorporated company is the best way forward." (GX 53). Jane Street then used its UK company to create its BitMEX account and deposited tens of millions of dollars worth of Bitcoin into the account for trading purposes. (GX 92). BitMEX was fully aware that Jane Street was trading from within the United States, because BitMEX executives circulated an internal list of

13

accounts that were known to be trading from within the United States, which included Jane Street. (GX 52).

**Jump Trading**

Jump Trading is the commonly used name for Tai Mo Shan Ltd., a Chicago-based trading firm that was KYC'd by both Coinbase and Gemini as a U.S. entity:

Coinbase KYC (GX 9):



Gemini KYC (GX 15):



Jump Trading is yet another entity for which BitMEX relies on its onboarding documents to try to argue that Jump was a Cayman Islands entity. But BitMEX executives regularly met with Jump in Chicago and corresponded with Jump personnel in Chicago regarding Jump's trading on BitMEX. (GX 54, 55, 56). As with BitMEX's other United States customers, this evidence about where the customer relationship was actually maintained is especially probative.

Moreover, Jump Trading offers another example of the open way in which BitMEX's top executives understood the corporate onboarding process to be a sham that had no relationship to the actual trading location. When Jump was onboarding its account, Greg Dwyer sent a message to Ben Delo, noting that "Jump Trading … ha[s] a company set up in the Cayman," but they had "tried to set up their account from inside the states." (GX 57). Dwyer asked Delo to "update their country to Caymen Islands." He then emailed a Chicago-based Jump Trading employee, telling her to "go ahead and create the account first and then we will update the Country of Residence on our end." (GX 57). This demonstrates again how BitMEX understood that its onboarding processes with offshore entities were just meant to paper up the account, and that the real entity opening the account was the Chicago entity.

14

**CONCLUSION**

BitMEX's criminal conduct in this case involved willfully serving United States customers without complying with United States KYC and AML requirements. In its sentencing submissions, the Company has chosen to rely on that very same criminal conduct to obscure the true magnitude of its criminal offense. This issue is especially salient with respect to the United States crypto trading firms that were high-volume customers of BitMEX, and thus especially important to BitMEX's business. The evidence shows that Coinbase and Gemini, cryptocurrency exchanges that in fact implemented KYC programs during the Relevant Period, correctly identified these crypto trading firms as U.S. entities. The evidence also shows that BitMEX chose a different path, advising its U.S. customers to place their trading accounts in the name of offshore shell entities even while knowingly facilitating those customers' trading and trading-related operations from within the United States. BitMEX is now asking this Court to rely on BitMEX's own criminal conduct to find that these trading firms were not U.S. entities. The Government respectfully submits that the Court should reject that invitation.

Dated: New York, New York
       December 12, 2024

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

                                By:     _____s/    Thane Rehn_____
                                        Jessica Greenwood
                                        Thane Rehn
                                        Assistant United States Attorneys
                                        (212) 637-1090/2354